UNITED STATES of America, Plaintiff–Appellee,

v.

Abdur–Raheem AKRAM, Defendant–Appellant.

No. 97–4429.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 18, 1998.

Decided Jan. 13, 1999.

---

**13.** Consistent with the district court, we assume, without deciding, that Plaintiff is an ERISA participant.

Christian H. Stickan, Asst. U.S. Attorney, John D. Sammon (argued), Dan Aaron Polster, Asst. U.S. Attorney (briefed), Office of the U.S. Attorney, Cleveland, OH, for Plaintiff–Appellee.

Sonja C. Rowan (argued and briefed), Federal Public Defender's Office, Cleveland, OH, for Defendant–Appellant.

Before: GUY, NELSON, and MOORE, Circuit Judges.

MOORE, J., delivered the opinion of the court, in which NELSON, J., joined. GUY, J. (pp. 457–460), delivered a separate dissenting opinion.

## OPINION

MOORE, Circuit Judge.

This case concerns the constitutionality of a stop and search of the appellant's U–Haul

truck, in which police found contraband videotapes and audiotapes. The initial stop of the truck was justified by a police officer's observation of a traffic violation, and the search of the truck was justified by information the police had obtained in an encounter with the appellant the day before. We therefore **AFFIRM** the district court's order denying the appellant's motion to suppress the evidence obtained from the search.

## I. BACKGROUND

On February 26, 1997, Abdur–Raheem Akram was riding in a U–Haul driven by Charles Bassett, heading east on the Ohio Turnpike. Mark Gooding of the Ohio State Highway Patrol ("OSHP") stopped the truck after determining that it was traveling at sixty-seven miles per hour.[1] The posted speed limit was sixty-five miles per hour for most vehicles but fifty-five miles per hour for trucks over eight-thousand pounds. *See* OHIO REV.CODE ANN. § 4511.21(D)(3) (Banks–Baldwin West 1994 & Supp.1998). Believing that the degree to which Bassett had violated the speed limit depended on the total weight of the truck and its contents, Gooding asked Bassett what they were carrying.[2] Bassett said there was nothing in the truck. When Gooding later asked Akram the same question, Akram said they were carrying pillows and comforters. Akram also told Gooding that they were traveling from Detroit to New York, which Gooding considered "source cities" for narcotics. Akram was unable to produce rental papers for the truck.

These facts aroused Gooding's suspicion, and he enlisted the aid of Paul Newburn and Xaver, also of the OSHP. Xaver is a dog trained to detect drugs, and Newburn is his handler. Gooding told Akram to pull the truck up the highway to where Newburn and Xaver were working. On Xaver's second walk around the truck, he alerted by scratching at the back of the vehicle, and the officers searched the truck. They found no drugs, but they did find ten to fifteen boxes contain-

ing videotapes. Gooding noticed several titles that he did not think had been released to the public. Akram told Gooding that the tapes were "bad" and that he was returning them to New York. Unsure how to proceed, the officers called an OSHP investigator, who promised to call back and advise them. Forty-five minutes later, when the investigator had not called back, Gooding decided to release Bassett and Akram with warnings about their speed, possession of the tapes, and failure to produce their rental agreement. Soon after the pair had left, the OSHP investigator called back and told the officers that they could have arrested Bassett and Akram. The officers and the investigator discussed how they should proceed if a similar situation arose in the future.

Early the next morning, February 27, Bassett and Akram were driving their U–Haul on the same highway, this time headed west. Newburn and Xaver had been driving ea t and were in the process of crossing over to the westbound side when Newburn saw the truck. According to his testimony, he did not recognize either the truck or its occupants from the day before, but he did observe that the truck "went from the passing lane to the driving lane, and as I made my turn, went over the white line," all without signaling. Joint Appendix ("J.A.") at 161, 173 (Newburn Test.). He pulled the truck over to the side of the highway.[3] When he approached the truck he recognized Akram and Bassett, and he called Gooding, who was working just a few miles away, to the scene.

Akram and Bassett told Newburn they were headed back home from New York. They still did not have rental papers, and this time they said they were carrying pillows and jewelry. Newburn led Xaver around the truck twice, and he says that Xaver again alerted. The parties dispute whether Akram consented to the subsequent search, which revealed the truck to be filled with apparently counterfeit tapes. The officers told Ak-

---

1. Contrary to OSHP policy, Gooding failed to videotape the stop.

2. Gooding was incorrect. The lower speed limit applies to any truck with *empty weight* over eight-thousand pounds. *See* OHIO REV.CODE ANN.

§ 4511.21(D)(3). The contents of the truck were therefore irrelevant to the speed limit violation.

3. This stop, like the one the day before, was not videotaped.

ram and Bassett to drive to an OSHP patrol post, where federal agents examined the tapes and determined that at least some of them were counterfeit.

Akram pleaded not guilty to charges under 18 U.S.C. § 2318, which prohibits trafficking in counterfeit videotapes, and moved to suppress the fruits of the February 27 search. The district court denied this motion, holding that a traffic violation and Xaver's alert justified the February 27 stop and search. Akram then changed his plea to guilty but reserved the right to appeal the adverse ruling. He was sentenced to twelve months plus one day of incarceration, to begin on January 5, 1998, followed by two years of supervised release. Akram then filed timely notice of this appeal.

## II.  ANALYSIS

■ This court reviews a district court's denial of a motion to suppress de novo but adheres to the district court's factual findings unless they are clearly erroneous. *See United States v. Diaz*, 25 F.3d 392, 394 (6th Cir.1994).

### A.  PROBABLE CAUSE FOR THE FEBRUARY 27 STOP

### 1.  Failure to Signal a Lane–Change

■ The parties dispute whether Newburn stopped the U–Haul on February 27 because of traffic violations or because he recognized Akram and Bassett from the previous day. However, an officer who has probable cause to believe a civil traffic violation has occurred may generally stop the vehicle regardless of his or her subjective motivation for doing so. *See Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (en banc), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994). Newburn had probable cause to stop the truck because it failed to signal before changing lanes, in violation of Ohio law. *See* OHIO REV.CODE ANN. § 4511.39.

In the briefs, the parties focused on whether the truck had violated Ohio's general prohibition of changing lanes "until the driver has first ascertained that such movement can be made with safety." OHIO REV.CODE ANN. § 4511.33(A). However, both Newburn and the district court noted the truck's failure to signal its lane-change. Section 4511.39 of the Ohio code requires the use of a turn signal when changing lanes, regardless of whether a driver complies with § 4511.33(A)'s general admonition to be safe. We affirm the constitutionality of the stop on the basis of the truck's violation of § 4511.39.

### 2.  Credibility of the Prosecution's Witnesses

■ The dissent makes a strong case for disbelieving Newburn's explanation for the February 27 stop. We agree that this case is an example of the very questionable police conduct that is permitted by *Whren* and *Ferguson*. Were the author of this opinion writing on a clean slate, she would hold that the police may not use a trivial traffic violation as a pretext for stopping a vehicle, when their real purpose would not justify a stop. We are, however, bound by the opposite holding. While the dissent demonstrates that the officers were uninterested in the traffic violation and were really looking for drugs, the point of *Whren* and *Ferguson* is that the motives of the police are irrelevant. A traffic violation provides a justification under the Fourth Amendment for a stop, and the stop is deemed valid, regardless of the motive, unless the motorist can demonstrate that the police have violated some other provision of the Constitution, such as the Equal Protection Clause. Akram has not tried to do so, and we cannot see a basis for distinguishing this case from other cases of pretextual stops.

■ Of course, the dissent is also correct that we could hold the stop unconstitutional if we did not credit Newburn's testimony. To do so, we would have to conclude that Newburn was lying not just about his motive for the stop but also about the historical fact of whether the truck failed to signal. The district court, which is charged with primary responsibility for determining witness credibility, believed Newburn's testimony that he did not see the truck signal its

lane-change. J.A. at 78 (Dist.Ct.Op.). We review that factual finding for clear error, giving due deference to the district judge's credibility determination. *See Diaz,* 25 F.3d at 394. Certainly this standard for reviewing that finding is not so high that it can never be overcome. However, Akram and Bassett never contradicted Newburn's testimony. Instead, Akram has argued to us that "it was safe for Mr. Akram's truck to move out of the passing lane into the right side lane without signaling." Akram Br. at 15; J.A. at 28 (Suppl. Mot. to Suppress). In addition, the fact that the proceedings in the district court did not initially focus on the signaling issue could have led the district court to give Newburn's testimony more credit. His statement that the truck did not signal was an explanation of what he saw, given in response to a question from the court, rather than part of the prosecution's justification for the stop. In the absence of any contradictory testimony, we will abide by the district court's findings of fact.

## B. PROBABLE CAUSE FOR THE FEBRUARY 27 SEARCH

 The preferred procedure for searching private property is for the government to obtain a warrant. *See Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). One of the exceptions to this requirement is the "automobile exception," which excuses the police from obtaining a warrant when they have probable cause to believe that a vehicle they have stopped at the side of the road contains evidence of a crime. *See United States v. Pasquarille,* 20 F.3d 682, 690 (6th Cir.) (citing *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)), *cert. denied,* 513 U.S. 986, 115 S.Ct. 481, 130 L.Ed.2d 394 (1994). When a judicial officer issues a search warrant, we review his or her determination of probable cause with deference. *See United States v. Rosenbarger,* 536 F.2d 715, 719 (6th Cir.1976), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2920, 53 L.Ed.2d 1060 (1977).

However, when a search is conducted without a warrant, the district court decides whether the objective facts known to the officers established probable cause, and we review that decision de novo. *See Diaz,* 25 F.3d at 394; *Pasquarille,* 20 F.3d at 685.

We hold that the search was constitutional because the information obtained during the February 26 search provided probable cause to believe there would be contraband or other evidence of criminal activity in the truck on February 27. We reject Akram's argument that the information obtained on February 26 was "stale" and could not justify a repeat search.[4]

 To determine whether evidence establishing probable cause is "stale," we consider the inherent nature of the suspected crime and the objects sought. *See Andresen v. Maryland,* 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976) (noting that business records are likely to be kept); *United States v. Canan,* 48 F.3d 954, 958 (6th Cir. 1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996) (stating that older information is more likely to support finding of probable cause when criminal activity is on-going); *United States v. Henson,* 848 F.2d 1374, 1382 (6th Cir.1988) (same), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989). Given the nature of the crime and the tapes, it might have been unreasonable to expect the *same* tapes to be in the truck on the second day. However, all that was needed to justify a search was probable cause that the truck would contain some evidence of a crime. *See Pasquarille,* 20 F.3d at 685–86 (quoting *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)).

The inherent nature of the crime and the facts known to the officers would have caused a reasonable person to believe that the truck contained evidence of a crime. The officers knew that Akram and Bassett were returning from a transaction of some kind involving contraband tapes. They were there-

---

4. Akram does not challenge whether, on February 26, the officers had a reasonable suspicion of drug activity to justify detaining Akram and Bassett beyond the scope of the initial stop. *Cf. United States v. Mesa,* 62 F.3d 159, 162–63 (6th Cir.1995) (holding that motorists could be further detained only if "something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention").

fore likely to have with them either new tapes or some evidence that would identify their supplier. On February 27, they told Newburn that they were carrying pillows, the same things Akram had falsely claimed to be carrying the day before. Finally, the officers had observed on the first day that the truck was filled to only a fraction of its capacity. J.A. at 140 (Gooding Test.) (describing ten to fifteen boxes, each at most two cubic feet in volume). A reasonable person would expect that the truck had been rented for some purpose. Since it was not being used to carry more than could fit in an ordinary car on the outbound trip, one would infer that Akram and Bassett planned to acquire more cargo at some point in their trip.

Our holding does not mean that police officers, having once observed a person in the possession of contraband, are free to search that person's effects at any time in the future. *Compare United States v. Weaver*, 99 F.3d 1372, 1378–80 (6th Cir.1996) (holding that affidavit did not establish probable cause where "only claim of possible wrongdoing is the averment that ... the informant was on the suspect premises and, while there, he saw some quantity of marijuana"), *and United ed States v. Hatcher*, 473 F.2d 321, 323–24 (6th Cir.1973) ("The mere fact that two persons known to have been engaged in trafficking in narcotics were observed on the same premises cannot justify a search of the premises without something more."), *with United States v. Caicedo*, 85 F.3d 1184, 1192–93 (6th Cir.1996) (holding that defendant's arrest in connection with companion's possession of cocaine, coupled with defendant's attempt to conceal his address and officer's experience that many drug traffickers keep contraband in their homes, established probable cause to search defendant's home). Here, Akram's statement about the purpose of the journey and the apparent fact that he and Bassett expected to need a truck for the return trip provided the necessary evidence that the illegal activity observed on February 26 was part of a continuing course of conduct. It was objectively reasonable for Newburn to believe on February 27 that he had found Akram and Bassett in a later stage of com-

mitting the same criminal act he had witnessed the day before.

## III. CONCLUSION

Because the February 27 stop and search of Akram's U–Haul were justified by probable cause, we **AFFIRM** the district court's judgment of conviction.

RALPH B. GUY, Jr., Circuit Judge, dissenting.

Believing that the district judge was clearly erroneous in crediting the police officers' version of what occurred, I would reverse.

In *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993), we upheld a search made by police officers after a stop for a minor traffic offense, even though the main purpose of the stop was the suspicion that the vehicle may have been carrying narcotics. Subsequently, the United States Supreme Court put its seal of approval on such pretextual vehicle stops in *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

It is clear from the number of cases reaching our court that police within the Sixth Circuit make full use of the technique of stopping vehicles for minor traffic infractions with the hope that circumstances will develop which ultimately will allow them to make a legal search of the vehicle. The February 26 search in this case falls into that category. When there are no unusual traffic or weather conditions, police officers on traffic patrol simply do not stop vehicles on interstate highways for speeding when they are only exceeding the speed limit by two miles per hour.

Apparently reluctant to justify the stop on the basis that it was going two miles over the limit, Officer Gooding tried to justify it as a stop of a truck weighing over 8,000 pounds. Such vehicles are subject to a speed limit of 55 miles per hour. This justification is entitled to no credence, however, since it is only trucks whose *empty* weight is over 8,000 pounds that are subject to the lower speed limit. It is clear that Officer Gooding knew this rental truck did not meet the empty weight standard because he testified that he asked about the weight of the truck's con-

tents. Since the load weight is not relevant it is reasonable to conclude that this line of questioning was just a ruse to inquire into the truck's contents, which certainly would not be relevant to the issuance of a speeding ticket.

Bassett testified he was only going 65 miles per hour and since Gooding does not seriously challenge this but, rather, relies on the 55 mile per hour speed limit being applicable, the only conclusion one can reach is that there was no *legitimate* reason to stop this vehicle on February 26. There was, nonetheless, another reason why this vehicle was stopped.

All of the officers involved in this case were part of a highway drug interdiction unit. Although they could, and I assume would, stop vehicles committing egregious traffic offenses, traffic patrol was not their primary mission. Nor do they rely on just "getting lucky" when making truly legitimate traffic stops. This would be a non-productive waste of manpower. It is clear to me from the cases that reach our court—including this one—that the officers are looking for "profile" or "target" vehicles and occupants.

A rental truck is a profile or target vehicle. That this was not admitted by the police officers is not controlling in my view. Credibility is the issue here and, in making credibility determinations, a court can utilize what is specifically part of the record, what has been learned from other similar cases, and all reasonable inferences that can be drawn therefrom.[1] We routinely tell jurors that although they have to decide the case before them on the basis of the testimony and exhibits, they do not have to leave their common sense at the courthouse door. Surely judges, who are more experienced and sophisticated than the average juror about legal matters and court proceedings, are entitled to factor common sense into the credibility equation.

Rental vehicles are profile vehicles because the police know they have become popular with persons transporting contraband. There are several reasons for this popularity. First, they can be obtained at a relatively low cost. Second, when the plates and registration are checked, they reveal nothing about the vehicle's occupants. Third, they are little more than a large box on wheels and are completely windowless, thus affording privacy to those carrying contraband. Finally, if the vehicle is stopped and contraband is found, there is no worry about forfeiting the vehicle since it does not belong to the wrong-doer.

Whether the race of the occupants is also a part of this profile is a very sensitive issue and one I will not push beyond the record. The record does show, however, that before this vehicle containing two African Americans was stopped on February 26, Officer Gooding pulled alongside the vehicle and looked at the driver, then dropped back, put on the lights and pulled over the vehicle.[2] The record also shows that before Newburn stopped the vehicle on February 27, it passed him as he sat in the highway median. In this regard, I am willing to credit Newburn's testimony that he did not recognize the vehicle as the one he stopped the day before. He did not need to; it was yet another target vehicle.[3]

Before turning to the stop on February 27, a few additional observations about the stop on February 26 are relevant to the credibility issue. First, there is little or nothing from which one can conclude that there was any basis for a reasonable suspicion that the truck was carrying narcotics, yet a narcotics dog was called to the scene.[4] But this should not surprise anyone, since a narcotics dog will always be called to the scene when a

---

1. Officer Newburn was asked:

    Q. How many rental vehicles had you stopped the previous day, the 26th?
    A. I have no idea, ma'am.

2. The parts of the transcript that convey this information were not made part of the appendix.

3. Out-of-state plates, particularly those from border states, are usually a component of the profile. This truck had out-of-state plates.

4. Gooding relied on the often used "source city" justification. Every urban area in the country is a source city. This is entitled to little or no weight in my view, unless the person stopped just came from someplace like Medellín, Colombia.

target vehicle is stopped by a drug interdiction unit. These officers work as a team and the dog is never more than minutes away. All that is necessary is to detain the driver long enough for the dog to arrive, which was done here. Why would the driver be put in the back of the police car and held there for an hour or more? Certainly not for exceeding the speed limit by two miles an hour.

Second, although the dog allegedly alerted, no narcotics were found after a thorough search.[5] One other fact is telling. Although one or more of the police cars, including the car driven by Gooding (who made the initial stop), was equipped with a video camera, it either (1) was not working, (2) was not turned on, or (3) was out of tape. When asked, the officers professed no knowledge of departmental policy relative to recording stops on video.

Since the arrest was a product of the February 27 stop, the court basically discounts the events of February 26. For me, however, they reveal worlds about what was really going on and are relevant to the all important issue of credibility.

Even if the focus is limited to February 27, the stop on that day will not pass the credibility test. The court resolves this case on the basis of an alleged failure on the part of the defendant to signal a lane change.[6] When the totality of the record is examined, however, this theory will not hold water.

Bassett testified as follows:

Q. Were you stopped again by troopers?

A. Yes.

Q. Okay. Can you tell me what happened?

A. Well, I was in the left hand—the left lane and was going—we passed him up and then he pulled out and I changed lanes back to the right lane. He pulled behind me, I was doing 55, and he turned on the

lights and he told me, he says, "You are swaying and you crossed the yellow line." This is what he said.

. . . .

Q. You said you were stopped for an improper lane change?

A. No, he stopped me for crossing the yellow—crossing the yellow line. He said I swayed across the yellow line in the left passing lane.

Q. Okay. So what exactly do you recall the trooper saying to you that day when he first comes up?

A. He says this, he says, ' There you go, you swung across the yellow line, you driving," you know, you know, "swaying across the line."

But I had already—I changed over the right lane when he had come behind, but that's what he said when he stopped me.

At the suppression hearing, Newburn testified:

Q. And approximately 7:00 a.m., or shortly thereafter, did you make a stop?

A. Yes, sir. I believe the radio log has 7:10, I had it as 7:18 on my case report. I was traveling eastbound on the Ohio Turnpike, just coming over to the crossover, median crossover area, and a vehicle coming westbound—I was still coming out—the vehicle coming westbound, again a U–Haul truck, went from the passing lane to the driving lane, and as I made my turn, went over the white line.

Q. Off onto the shoulder area?

A. It's not really the shoulder, it's the paved berm area with a white line border there, and at that time I got behind the vehicle and I stopped the vehicle for that lane violation.[7]

It was only near the end of Newburn's testimony in response to a question from the

---

**5.** The dog alert is another gray area. Some are "aggressive" alerters and others are passive. The person stopped certainly will not know. Incredibly enough, Officer Gooding, who is part of the "team," said he did not know what the dog does when it alerts.

**6.** Bassett was apparently the driver of the rental truck on both days, not Akram.

**7.** Akram also testified that when Newburn approached the rental vehicle, he came to the passenger side and said to Akram, " 'What are you doing?' He said, 'You watching me to see if I'm watching you, and you crossed the yellow line.' "

court that the matter of failure to signal was even mentioned:

THE COURT: Why, again, did you stop this one?

THE WITNESS: The 27th, I stopped the vehicle for improper lane change.

THE COURT: Meaning what?

THE WITNESS: Meaning that the vehicle went from the passing lane to the driver's lane and then over on to the white line, sir, without signaling to do so.

This was the first time anyone even mentioned a failure to signal. This is important because it needs to be viewed in a proper context. No paper or record exists of any kind documenting this traffic offense. In all of the cases of this nature that have come before our court, no one, to the best of my knowledge, has ever been issued a violation notice.[8] There is universally a complete lack of any type of contemporaneous corroboration of why the vehicle was stopped.

There are two other facts that bear on credibility with regard to the February 27 stop. Once again, old reliable Xaver alerted on the truck and once again no narcotics were found. Nonetheless, the alert enabled Officer Newburn to proceed as follows:

A. [Akram testimony] ... And he informed us to stay in the car and he went back to the car and got the dog and he brought the dog out.

Q. Did you see him come back up with the dog?

A. Certainly. I'm sitting in the passenger's side and he started on my side.

Q. Did you come to be taken out of the truck at any time that day?

A. Yes.

Q. What happened?

A. He took me to the back of the truck. First he asked for the key, and took the key out of the ignition and went to the back of the truck. And he said, "Open the truck."

And I, you know, made a gesture to plead with him to let us go.

He said, "Don't come near me. If you come near me I'm going to shoot you."

So he said, "Open the truck." So I opened the truck and that was that.

Legally, the police can now stop a vehicle for any alleged traffic violation and, while the vehicle is stopped, subject it to a canine sniff or hold the vehicle until a dog arrives on the scene. They also can have a profile and stop target vehicles if they find them committing a traffic offense,[9] but—they still must have a legitimate traffic offense as the basis for the stop. I do not believe the officers did here—but, more importantly, I do not believe the district judge could properly conclude they did on the basis of this record. The courts have given the police this extraordinary power to make pretextual stops and searches of vehicles, but it is also the responsibility of the courts to make sure the testimony of police officers is given the same critical scrutiny given to a defendant's testimony. This was not done here, and I would reverse the denial of the suppression motion.

---

8. Warning citations are sometimes issued but these have no legal effect.

9. A racial component in the profile would, of course, raise other considerations.