UNITED STATES of America,
Plaintiff,

v.

Kellie Edward ANDERSON, Defendant.

No. Crim. 98–50061.

United States District Court,
E.D. Michigan,
Southern Division.

April 1, 1999.

Federal Defender, Federal Defender Office, Flint, MI, for Kellie Edward Anderson, defendant.

James C. Mitchell, U.S. Atty's Office, Bay City, MI, for U.S.

### MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

GADOLA, District Judge.

Presently before the Court is defendant Kellie Edward Anderson's motion to suppress evidence filed on January 29, 1999. The instant motion seeks suppression of evidence resulting from defendant's arrest and search on April 2, 1998 and from a search of his upstairs rooms located in his mother's residence located at 1511 Wayne Street conducted on April 3, 1998. Defendant's motion also includes a request for suppression of inculpatory statements made by defendant after his arrest on April 2, 1998 and after the search of his mother's residence on April 3, 1998.

Police officers stopped defendant's minivan after he had allegedly committed a minor traffic violation. Defendant was removed from the vehicle, arrested and searched. The search revealed 15 to 20 rocks of crack cocaine taken from defen-

dant's right front pants pocket. Thereafter, in the early morning hours of April 3, 1998, police officers conducted a search of his rooms in his mother's residence, which uncovered, *inter alia*, crack cocaine, marijuana, money, scales, a firearm, ammunition, packaging materials, and drug paraphernalia. Defendant was interviewed again later that morning, at which time he made further inculpatory statements regarding his involvement in drug trafficking activities. The government responded to defendant's motion to suppress on February 4, 1999.

On February 19, 1999, an evidentiary hearing was conducted. Defendant called two witnesses: his mother, Mrs. Bobbie Anderson, and Mr. Cameron Henke, an investigator with the Federal Defender's Office. The government presented the testimony of Officer Michael Angus, Officer Mark Gern, and Sgt. Harold Payer, all employed by the Flint Police Department. At the close of the hearing, the Court instructed the parties to submit supplemental briefs on the issue of the efficacy of defendant's mother's consent to search the upstairs portion of the residence occupied by defendant, as well as any other issues germane to the instant case. Accordingly, defendant submitted a supplemental brief on March 4, 1999 and the government filed a brief in opposition on March 12, 1999.

For the reasons set forth below, the Court will deny defendant's motion to suppress evidence.

### I. Factual Background

On April 2, 1998, at approximately 7:00 p.m., officers of the Flint Police Department began a surveillance of the residence located at 1511 Wayne Street. Police had information that an African–American male individual who drove a black minivan resided at the address and was involved in the selling of crack cocaine. At approximately 8:00 p.m., the officers began following a 1998 GMC black minivan after its departure from 1511 Wayne Street.

Shortly after 10:00 p.m., one of the surveilling officers, Officer Michael Angus, ob-

served Anderson fail to come to a stop while driving out of the parking lot of the Park Manor Apartment complex onto Lapeer Road. Officer Angus then followed Anderson in an unmarked police car for several blocks, purportedly observing him driving between 5 to 10 miles per hour in excess of the speed limit. Flint Police Officers Mark Gern and Christopher Bigelow, driving a fully marked police car, were then directed by Angus to stop Anderson for the above-mentioned violations of the traffic laws.

At the hearing, Officer Angus testified that defendant's van failed to come to a stop before entering onto Lapeer Road, in violation of the traffic laws. Angus further testified that he estimated, using his best judgment and experience, that the van was traveling 40 miles per hour in the 35 miles per hour speed zone. According to Angus, he contacted dispatch at the time he was pacing the van, whereupon Officers Gern and Bigelow responded and subsequently stopped the vehicle shortly after it turned onto Dort Highway.

According to Officer Gern's testimony, he was the first officer to approach the van at the driver's side window. Officer Angus testified that as he approached the window, he saw Officer Gern step back from the window, whereupon Gern informed Angus that defendant was moving his hands around his waistband area, indicating that he could have a weapon. Both Angus and Gern stated at the hearing that at this point, however, neither officer drew his weapon.

According to Officer Angus, fearing the possibility of a weapon, he approached the driver's side window and directed defendant to place his hands first on the steering wheel and then on the open windowsill where they could be seen. From his position adjacent to and above the driver's side door, Officer Angus testified that while defendant's hands were still on the steering wheel, the officer observed a package of cigarette rolling papers and a baggie containing suspected marijuana visible in

defendant's open left coat pocket. According to Angus, defendant was then ordered by the officer to step out of the vehicle and was placed under arrest. In the resulting search incident to arrest, police seized 15 to 20 rocks of crack cocaine from defendant's right front pants pocket.

Sgt. Harold Payer testified that at the Criminal Investigation Bureau interview room shortly after the arrest, defendant gave a statement to police after being read his *Miranda* rights. At this point in time, it is uncontested that defendant admitted to selling crack cocaine, making approximately $30 to $40 per night to supplement his income. Defendant further informed Sgt. Payer that he resided with his mother, Ms. Bobbie Anderson, in a residence located at 1511 Wayne Street. Defendant also stated, according to Payer, that he lived with his girlfriend at another location approximately two days per week.

Sgt. Payer testified that after consulting with a Genesee County assistant prosecuting attorney, Officer Felix Trevino, Officer Angus, and he went to 1511 Wayne Street. At the residence, Sgt. Payer testified that he approached the front door and advised defendant's mother, Mrs. Bobbie Anderson, of her son's arrest and that the officers suspected that additional crack cocaine was located in the home. Sgt. Payer further testified that at this point Mrs. Anderson invited the officers inside the home.

Once inside the home, Sgt. Payer requested that Mrs. Anderson sign a consent form allowing the police to search the residence. Sgt. Payer testified that Mrs. Anderson responded affirmatively when asked whether she was able to read. Thereafter, the sergeant and Mrs. Anderson sat at the dining room table where he went through the form with her and she "followed along." Mrs. Anderson then signed and dated the form in the appropriate boxes.

According to Sgt. Payer, Mrs. Anderson said that she does not "usually" go upstairs, but that her grandchildren do go upstairs from time to time. Mrs. Anderson also indicated that she was suffering from lupus. According to Sgt. Payer, Mrs. Anderson did not indicate that she had "never" gone upstairs nor downstairs to the basement, but did indicate that she avoided the upstairs rooms because she suspected her son's illegal activities.

Mrs. Anderson's testimony at the hearing is largely consistent with Sgt. Payer's account of the events which transpired prior to the search on April 3, 1998. However, Mrs. Anderson did testify that she could not read, not due to physical infirmity, but due to illiteracy. She stated at the hearing that after she admitted the police officers into the house, they told her that if she did not sign the form that she they would come back during daylight hours. According to Mrs. Anderson's testimony, the officers indicated that if they had to return they would tear the place up and she felt scared. Sgt. Payer, however, denies that any threats of any kind were made. Also according to Mrs. Anderson, she told the officers she "never" goes upstairs due to lupus.

After Mrs. Anderson completed the consent form, which she does not deny signing, the officers searched the upstairs portion of the house, consisting of a bedroom, an entertainment room and a closet in the hallway. The hallway to the upstairs communicates with the stairway and there is no door or other obstruction of any kind preventing access. There is no indication that either the door to the bedroom or the entertainment room was locked.

The search lasted approximately three hours and was confined to the upstairs. Police seized crack cocaine, marijuana, money, scales, a firearm, ammunition, packaging materials, and drug paraphernalia, among other items. After the search, on April 3, 1998, at 3:15 a.m., defendant was again interviewed by Sgt. Payer. After being advised of and waiving his *Miranda* rights, defendant further detailed his narcotics activities and acknowledged his ownership of the items seized from 1511 Wayne Street.

## II. Analysis

There are two separate searches at issue in the instant case. The first concerns a search incident to defendant's arrest on April 2, 1998, conducted after police officers stopped defendant's minivan after an alleged traffic violation. The second event under consideration is the search on April 3, 1998 of defendant's upstairs rooms in his mother's residence located at 1511 Wayne Street, conducted after police officers purportedly obtained Mrs. Anderson's third-party consent. The Court will address the validity of each of these searches *seriatim.*

### A. The stop of defendant's minivan, arrest, and subsequent search of his person

The first issue presented in the context of the stop of defendant's van is whether the stop itself was valid. The government readily admits that the stop of defendant's van was "pretextual." In other words, the underlying motivation of the officers in stopping defendant's vehicle was not to enforce the state's traffic laws but rather to investigate possible criminal drug violations.

■■■■ A stop by government agents of a vehicle constitutes a "seizure" even if for a brief period of time and for limited purposes. *See Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89 (1996). Accordingly, such a stop must comport. with the Fourth Amendment requirement of reasonableness. *See id.* As the United States Supreme Court has held,

> [a]n automobile stop is ... subject to the constitutional imperative that it not be "unreasonable" under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred. [*See Delaware v. Prouse,* 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660 (1979); *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam).]

*Whren,* 517 U.S. at 810, 116 S.Ct. 1769. The test endorsed by the Supreme Court is whether the particular officer making the stop, regardless of his actual subjective motives, had *probable cause to believe* that a traffic offense had occurred. *Id.* at 813, 116 S.Ct. 1769. This objective test was applied in the Sixth Circuit even before the Supreme Court's pronouncement in *Whren. See U.S. v. Ferguson,* 8 F.3d 385 (6th Cir.1993) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment").

In a most recent case involving a factual scenario similar to the one presented in the case at bar, the Sixth Circuit applied the *Whren* test to validate such a pretextual stop. *See U.S. v. Akram,* 165 F.3d 452 (6th Cir.1999) (Guy, J., dissenting). In *Akram,* a U–Haul truck in which defendant was riding failed to signal before changing lanes in violation of Ohio law. *See id.* at 455. Defendant argued that the subsequent stop of the vehicle was due not to the driver's failure to signal, but rather to the fact that the police officer recognized the occupants from the previous day and suspected that they were transporting illicit drugs. The Sixth Circuit in rejecting defendant's argument reasoned as follows:

> Were the author of this opinion writing on a clean slate, she would hold that the police may not use a trivial traffic violation as a pretext for stopping a vehicle, when their real purpose would not justify a stop. We are, however, bound by the opposite holding. While the dissent demonstrates that the officers were uninterested in the traffic violation and were really looking for drugs, the point of *Whren* and *Ferguson* is that *the motives of the police are irrelevant.* A traffic violation provides a justification under the Fourth Amendment for a stop, and the stop is deemed valid, regardless of the motive, unless the motorist can demonstrate that the police have violated some other provision of the

Constitution, such as the Equal Protection Clause.

*Id.* at 455 (emphasis added).

Defendant, while acknowledging the *Akram* decision, directs this Court's attention to the dissenting opinion authored by Circuit Judge Ralph B. Guy, Jr. *See Akram,* 165 F.3d 452, 457–60 (6th Cir.1999). Judge Guy casts a suspicious eye toward the police officers' asserted reason for stopping the vehicle in *Akram,* i.e., failure to signal before changing lanes. *See id.* at 459. Most significantly, the dissent concluded with the following commentary:

> Legally, the police can now stop a vehicle for any alleged traffic violation and, while the vehicle is stopped, subject it to a canine sniff or hold the vehicle until a dog arrives on the scene. They also can have a profile and stop target vehicles if they find them committing a traffic offense, but—they still must have a legitimate traffic offense as the basis for the stop. I do not believe the officers did here—but, more importantly, I do not believe the district judge could properly conclude they did on the basis of this record. The courts have given the police this extraordinary power to make pretextual stops and searches of vehicles, but it is also the responsibility of the courts to make sure the testimony of police officers is given the same critical scrutiny given to a defendant's testimony. This was not done here, and I would reverse the denial of the suppression motion.

*Id.* at 460 (footnote omitted).

■ This Court duly acknowledges the holding in *Akram,* as well as Judge Guy's reservations concerning the potential for abuse associated with the power to make pretextual stops. In light of this authority, the Court has closely scrutinized the government's purported reason for the stop. In the case at bar, Officer Angus testified that he observed defendant's van fail to come to a stop before entering Lapeer Road. He further presented testimony that he estimated while "pacing" defendant's vehicle that defendant was

traveling 40 miles per hour in a 35 miles per hour speed zone.

In an attempt to rebut this testimony, defendant presented the testimony of Cameron Henke, an investigator with the Federal Defender's Office. According to Mr. Henke, a former Michigan state police detective sergeant, it would take a mere 45 seconds to travel at 35 miles per hour from the parking lot of the Park Manor Apartments to Dort Highway, where defendant was subsequently stopped by the marked police cruiser. During cross-examination, Mr. Henke admitted to using his own personally-owned vehicle in conducting the experiment leading to his conclusion of 45 seconds. Mr. Henke further testified that he never calibrated his speedometer. Defendant, however, offers no evidence to rebut Officer Angus's assertion that he personally observed defendant fail to stop upon exiting the Park Manor Apartments parking lot.

The appropriate standard to apply, as discussed above, is whether Officer Angus had *probable cause* to believe that a traffic offense had occurred. Although defendant's witness has raised a question as to whether in fact Officer Angus could have paced defendant's vehicle concluding that defendant had violated the speed limit, and immediately thereafter called dispatch and requested that defendant be stopped in the span of 45 seconds, this Court is of the opinion that such events could have transpired during the period of approximately one minute. Furthermore, the government has shown that Officer Angus had probable cause to stop the vehicle when the officer observed it failing to stop upon entering Lapeer Road. The Court notes that the officer's testimony in this regard remains unrebutted. In addition, the Court finds Mr. Henke's experimental procedures to be somewhat imprecise and not conclusive as to the exact span of time which elapsed before defendant's van was stopped on Dort Highway.

Since this Court finds that according to Officer Angus's own unrebutted testimony

the officer had probable cause to believe that a traffic infraction had occurred, it is clear that upon conveying this information to Officers Gern and Bigelow they too possessed probable cause to believe such an infraction had occurred and were thus justified in making the stop. *See U.S. v. Averitt,* 477 F.2d 1009, 1010 (6th Cir.1973) (holding that there was probable cause for warrantless search of truck intercepted by other officers to whom surveillant officer had described activity over radio). As a result, the stop of defendant's van was permissible and not prohibited by the Fourth Amendment. *See Whren,* 517 U.S. at 810, 116 S.Ct. 1769; *Akram,* 165 F.3d 452, 455.

The next question is whether defendant's subsequent removal from the vehicle, his arrest and attendant search of his person were constitutional. The government maintains that Officer Gern approached the van at the driver's side window. Officer Angus then testified that as he approached the window, he saw Officer Gern step back, whereupon Gern informed Angus that defendant was moving his hand around his waistband area. Officer Angus further testified that he was placed in fear that defendant possessed a weapon, and therefore directed defendant to place his hands first on the steering wheel and then on the open windowsill where they could be seen.

From Officer Angus' position adjacent to the driver's side door, the officer alleges that he observed a package of cigarette rolling papers and a baggie containing what appeared to be marijuana located in defendant's open left coat pocket. At this point, defendant was ordered out the vehicle and placed under arrest. As stated previously, the resulting search incident to arrest revealed 15 to 20 rocks of crack cocaine seized from defendant's right front pants pocket.

The crucial issue with respect to the arrest and the search incident thereto is at what point in time Officer Angus allegedly observed the package of cigarette rolling papers and the baggie, which, as it was

later determined, did contain marijuana. Defendant is quick to point out that Officer Angus in his testimony at the preliminary hearing in state court contradicted himself as to the precise point in time when he allegedly saw the package of cigarette rolling papers and the baggie containing suspected marijuana in defendant's open left coat pocket. However, Officer Angus's testimony before this Court contained no such discrepancy, the officer clearly stating that he observed the contraband material prior to defendant's exiting the vehicle.

■ The Supreme Court has long endorsed the common law rule that "the Fourth Amendment permits a duly authorized law enforcement officer to make a warrantless [felony] arrest in a public place ... *after* developing probable cause for arrest." *U.S. v. Watson,* 423 U.S. 411, 427, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976) (emphasis added). Applying the Supreme Court's holding in *Watson,* this Court must therefore determine whether in view of all the surrounding circumstances probable cause existed to justify defendant's arrest on April 2, 1998.

■ The standard for determining probable cause in the context of arrest is whether the "facts and circumstances [were] 'sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'" *Gerstein v. Pugh,* 420 U.S. 103, 111, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (citing *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Henry v. United States,* 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); *Brinegar v. United States,* 338 U.S. 160, 175–176, 69 S.Ct. 1302, 1310–1311, 93 L.Ed. 1879 (1949)). As the Supreme Court stated in *Gerstein,* "[t]his standard, like those for searches and seizures, represents a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Id.* at 112, 95 S.Ct. 854. As the Supreme Court remarked on another occasion, probable cause is "a flexible, common-sense standard." *Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535,

75 L.Ed.2d 502 (1983). The probable cause standard

merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief ... that certain items may be contraband or stolen property or useful as evidence of a crime; *it does not demand any showing that such a belief be correct or more likely true than false.*" A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

*Brown*, 460 U.S. at 742, 103 S.Ct. 1535 (citation omitted) (emphasis added).

■ Applying this standard, the Court finds that Officer Angus's testimony supports a conclusion that the officer had probable cause to arrest defendant for possession of an illicit substance. The Court has examined the actual jacket worn by defendant on the night in question. *See* Govt's Exh. 1. After a thorough examination, the Court concludes that it is entirely plausible—given the material of the jacket, the seated position of the defendant relative to Officer Angus, as well as the nature of the jacket's open pockets—that the police officer observed the baggie containing marijuana prior to defendant's exiting the vehicle.

■ Furthermore, even had Officer Angus spotted the baggie after defendant had exited from the vehicle, as defendant's counsel seems to suggest, there would be no constitutional violation because the contraband material was in plain view: The plain view exception to the warrant requirement applies if the following requirements are met:

(1) the items were in plain view;

(2) the incriminating character of the items were immediately apparent, and

(3) the items were viewed by an officer lawfully located in a place from where the items can be seen and seized by an officer who has a lawful right of access to the items themselves.

*See Horton v. California*, 496 U.S. 128, 142, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). There is no dispute that the rolling paper and baggie containing marijuana were in plain view, such that the first requirement is met. Secondly, the "immediately apparent" prong is satisfied because the incriminating character of such items is immediately apparent when observed by an experienced police officer such as Officer Angus. *See U.S. v. Buchanan*, 70 F.3d 818, 826 (5th Cir.1995).

■ With respect to third prong, this Court has already determined that Officer Angus and the other officers were lawfully present because the stop of defendant's van was based upon probable cause to believe a traffic infraction had occurred. Even if Officer Angus had viewed these incriminating items *after* defendant exited the vehicle and before arrest, the officers would still have been lawfully present. It is well-settled that an officer may order a suspect to step out of a vehicle during a routine traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 108–09, 98 S.Ct. 330, 331–32, 54 L.Ed.2d 331 (1977).[1] In fact, a police officer may order a driver who has been lawfully stopped to step out of his vehicle even in the absence of unusual or suspicious behavior on the part of that driver. *Id.* at 111, 98 S.Ct. 330. Such an order is valid based upon the important public interest of protecting the safety of the police officer.[2] *Id.*

---

**1.** In *Mimms*, the Supreme Court balanced the public interest in the officer's safety against the minimal intrusion into the personal liberty of the citizen who is asked to step out of his car following a lawful stop. The Court concluded that such a request "hardly rises to the level of a 'petty indignity'.... What is at most a mere inconvenience cannot prevail when balanced against legitimate concerns for the officer's safety." *Mimms*, 434 U.S. at 111, 98 S.Ct. 330.

**2.** It also appears that Officer Angus would have been justified in conducting a frisk of defendant's person prior to the arrest, although the facts do not indicate whether such a frisk was performed. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ The remaining question concerns the validity of Officer Angus's search incident to arrest which revealed 15 to 20 rocks of crack cocaine. It is well-settled that police, contemporaneously with an arrest, may search a subject's person and the area "within his immediate control," or that area satisfying the so-called "wingspan" test. *See Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *see also U.S. v. Porter*, 738 F.2d 622 (4th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984). In the instant case, the cocaine was discovered on defendant's person, in his right front pants pocket, certainly an area "within his immediate control." There was therefore no violation of the wingspan test in the search of defendant's person pursuant to his arrest.

In light of the above, the Court holds that Officer Angus was justified in stopping defendant's minivan, and in subsequently arresting and searching defendant. There was no Fourth Amendment violation.

## B. The search of defendant's upstairs rooms in his mother's residence located at 1511 Wayne Street

Defendant challenges the April 3, 1998 search of his upstairs rooms located at 1511 Wayne Street. As justification for the officers' warrantless search, the government offers a consent form signed by defendant's mother, Mrs. Bobbie Anderson dated April 3, 1998, 12:10 a.m.

■ The Fourth Amendment protects persons against unreasonable searches and seizures by governmental agents, guaranteeing the right of the people "to be secure in their persons, houses, papers, and effects." U.S. CONST. AMEND. IV.[3] The Fourth Amendment is made applicable to the states via the Fourteenth Amendment's due process clause. *See Terry v. Ohio*, 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). As this Court recently held in *U.S. v. Hardeman*, 36 F.Supp.2d 770 (E.D.Mich.1999), the Fourth Amendment applies with special force in the context of warrantless entry into an individual's home such that warrantless entry by governmental actors will be considered presumptively unreasonable. *See Payton v.. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

■ Nevertheless, it is also well-settled that this presumption may be rebutted by a showing that a specific exception to the warrant requirement is applicable in the case under consideration. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). An exception to the warrant requirement may be found where exigent circumstances exist or where consent to search has been obtained either from the individual whose property is to be searched or from a third-party who possesses common authority over the premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *see also U.S. v. Mat-*

A frisk may be conducted where the officer was "rightfully in the presence of the party frisked" *and* "had a sufficient degree of suspicion that the party frisked was armed and dangerous." 1 W. LaFave & J. Israel, *Criminal Procedure* § 3.8(e) (1984). In the instant case, Officer Angus was allegedly informed that defendant was moving his hand back and forth around his waistband area, suggesting that defendant may have possessed a weapon. Given this circumstance coupled with the background information possessed by the officers relating to defendant's alleged drug trafficking activities, the Court finds that Officer Angus had a reasonable suspicion that defen-

dant was potentially armed and dangerous which was sufficient to justify a pat-down search.

**3.** The Fourth Amendment provides in full as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

*lock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). Since the instant case does not involve any exigent circumstances, and the government does not attempt to justify the search on this ground, the sole issues to be decided are whether Ms. Anderson possessed "common authority" over the premises and, if so, whether she gave her voluntary consent to the officers' entry into the home and the ensuing search conducted on April 3, 1998.

At the hearing held February 19, 1999, this Court allowed the parties to file supplemental briefs relating to the issue of defendant's mother's capacity to give valid third-party consent to the search of defendants' upstairs rooms located in his mother's residence. On March 4, 1999, defendant filed a supplemental brief and the government responded on March 12, 1999.

■ Defendant argues that his mother, Mrs. Bobbie Anderson, lacked authority to give valid third-party consent to search the upstairs rooms of her residence located at 1511 Wayne Street. At the hearing, Mrs. Anderson testified that she, her son and two grandchildren have resided at the residence for more than one year. Defendant's mother also stated that she pays the rent, but that defendant pays "the bills." Mrs. Anderson also testified that she has never been to the upstairs portion of her residence due to her medical condition as a sufferer of lupus.

The government points out that when the police officers entered the residence, Sgt. Payer observed that access to the second floor could be gained via an open stairway from the first floor living area. According to Sgt. Payer, at no time did Mrs. Anderson give any indication that she and the grandchildren did not have actual access to the two second floor rooms or that she had been denied access to enter the area. Furthermore, Sgt. Payer testified that although he was advised by Mrs. Anderson on the night in question that she was a long-term lupus sufferer, she at no time told officers that she could not go upstairs or that she had "never" been upstairs. According to Sgt. Payer, Mrs.

Anderson told officers that she does not "usually" go upstairs because of her son's illegal activities, but that her grandchildren do go up there "from time to time." Sgt. Payer testified that on the night in question, defendant's mother did not appear to have difficulty in walking, nor did he see her relying on a cane or any other walking aid.

The starting point for an inquiry into third-party consent is *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In that case, the Supreme Court held that valid consent to search a private residence need not be given by defendant himself, but also may be provided by "a third party who possesses common authority over the premises...." *Id.* at 181, 110 S.Ct. 2793. The Court defined "common authority" as "'mutual use of the property by persons generally having joint access or control for most purposes....'" *Id.* The burden of establishing common authority rests upon the government. *Id.*

It is also significant that the *Rodriguez* Court upheld the police officers' warrantless entry based upon third-party consent *even though* it later turned out that the landlord did not in actuality possess such authority. *Id.* at 187–88, 110 S.Ct. 2793. In so holding, the Supreme Court articulated the following "objectively reasonable" test:

> determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment ... 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises? *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Id.* at 188–89, 110 S.Ct. 2793.

The question becomes whether the police officers in the instant case could reasonably have believed that Mrs. Anderson

possessed common authority over the premises—more specifically, the upstairs rooms—in order to justify the search. Interestingly, *both* parties rely upon a most recent case addressing parental third-party consent to search, *United States v. Rith,* 164 F.3d 1323 (10th Cir.1999). In *Rith,* the Tenth Circuit upheld a parent's consent to enter an 18 year-old son's room, even in spite of the son's clear and contemporaneous revocation of consent. The court's holding was premised on the following rationale, which has direct application in the instant case:

> Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships. See, e.g., *United States v. Ladell,* 127 F.3d 622, 624 (7th Cir.1997) ("A third-party consent is also easier to sustain if the relationship between the parties—parent to child here, spouse to spouse in others—is especially close."); *United States v. DiPrima,* 472 F.2d 550, 551 (1st Cir.1973) ("[E]ven if a minor child, living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents."). In contrast, a simple co-tenant relationship does not create a presumption of control and actual access would have to be shown. See *United States v. Duran,* 957 F.2d 499, 505 (7th Cir.1992) ("Two friends inhabiting a two-bedroom apartment might reasonably expect to maintain exclusive access to their respective bedrooms without explicitly making this expectation clear to one another."); *United States v. Heisman,* 503 F.2d 1284, 1287 (8th Cir.1974) (although defendant's room did not have a door or a lock, co-tenant did not have authority to consent to a search of defendant's private areas). The difference between a husband-wife or parent-child relationship and a co-tenant relationship is that a husband-wife or parent-child relationship *raises a presumption* about the parties' reasonable expectations of privacy in relation to each other in spaces typically perceived as private in a co-tenant relationship. See, e.g., *Ladell,*

> 127 F.3d. at 624 ("Third-party consents to search the property of another are based on a reduced expectation of privacy in the premises or things shared with another.").

*Rith,* 164 F.3d at 1330 (emphasis added). The Tenth Circuit further commented that

> [u]nlike the fact-intensive inquiry of mutual use, control for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party. If a relationship creates such a presumption of control and is unrebutted, the third party has authority to consent to a search of the property.

*Id.* (footnote omitted); *see also* 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 3.10(e) (1984) ("If a son or daughter, *whether or not still a minor,* is residing in the home of the parents, generally it is within the authority of the father or mother to consent to a police search of that home that will be effective against the offspring.") (emphasis added).

Defendant cites *Rith* for its recitation of the general rule that "a third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Rith,* 164 F.3d at 1329. With respect to the Tenth Circuit's holding that a parent-child relationship creates a presumption of common authority, defendant maintains that the presumption has been rebutted by Mrs. Anderson's testimony at the hearing that she never went upstairs. Defendant further argues that defendant's payments of bills "provides an additional basis for removing him from any normal presumption. . . ."

In addition, defendant relies upon *United States v. Whitfield,* 939 F.2d 1071 (D.C.Cir.1991). In that case, the 29 year-old defendant resided at his mother's residence in an unlocked upstairs bedroom.

Two FBI agents visited defendant's mother at her residence and asked if they could search defendant's room, giving her a consent form to sign. *Id.* at 1073. However, she refused to sign the form, but then took the agents upstairs to the defendant's room. *Id.* The D.C. Circuit reversed the lower court's denial of defendant's motion to suppress, holding that "[a]s a factual matter, the agents could not reasonably have believed Mrs. Whitfield had authority to consent to this search. The agents simply did not have enough information to make that judgment." *Id.* at 1074.

Applying the above principles to the case at bar, this Court finds that Sgt. Payer could reasonably have believed that Mrs. Anderson possessed common authority over the premises, including the upstairs rooms, in order to allow her to give valid third-party consent to search. As the Tenth Circuit in *Rith* made clear, a police officer is entitled to rely upon the presumption of common authority created by the parent-child relationship, such as the one existing between defendant and Mrs. Anderson. The Court disagrees with defendant that the presumption has been rebutted. There is no indication that the upstairs portion of the house, consisting of an open hallway and two unlocked rooms, was subject to the *exclusive* control of defendant.[4]

It is important to note that in *United States v. Rith*, the court found that common authority existed *even where* there were "insufficient factual findings that Rith's parents had joint access to his bedroom to support a conclusion of their authority to consent to a search of the room." 164 F.3d at 1331. Despite this lack of factual evidence, the *Rith* court placed great emphasis on the government's showing that

> Rith lived with his parents and was not paying rent. Although Rith was eighteen years old, these facts raise a presumption of control for most purposes by Rith's parents over the entire home and thus they could have accessed Rith's room without his consent. There is no evidence to rebut this presumption: no lock on Rith's bedroom door; no agreement with Rith's parents that they not enter his room without his consent; no payment of rent. Because the presumption of control is unrebutted, Rith's parents had authority to consent to the search of Rith's bedroom.

*Id.* Just as in *Rith*, the government in the instant case has presented evidence that defendant lived with his mother for the greater part of the week and did not pay rent, although he did pay "bills." Furthermore, just as in *Rith*, defendant Anderson has presented no evidence of a lock on his bedroom door nor any evidence of an agreement with his mother that she may not enter his rooms without his consent. The presumption of control is unrebutted and Mrs. Anderson possessed the authority to consent to the search of the upstairs rooms.

Moreover, the instant case presents a factual situation distinguishable from the one found in *United States v. Whitfield*. In that case, the police lacked sufficient information upon which to base an objectively reasonable judgment that defendant's mother possessed common authority. By contrast, in the instant case, Sgt.

---

4. Although Mrs. Anderson testified at the hearing that she had "never" gone upstairs, this Court finds her testimony not to be credible, especially in light of Sgt. Payer's testimony that she had stated on the night in question that she "usually" does not go upstairs. Moreover, the claim of exclusive control over the upstairs portion of the house is undermined by the plausible testimony of the sergeant that Mrs. Anderson had stated that the two juvenile grandchildren do go upstairs "from time to time." Mrs. Anderson's credibility is also called into question by her testimony at the hearing that she is "illiterate." The Court finds this assertion highly suspect in view of the fact that Mrs. Anderson signed and dated the consent form quite legibly and in the appropriate boxes on April 3, 1998. Mrs. Anderson claim of illiteracy is further undermined by Sgt. Payer's testimony that on the night in question she had stated that "she could read," and in fact read along with the sergeant as he read the form aloud.

Payer questioned Mrs. Anderson for a period of time prior to the search and also obtained her signed consent to search. According to the sergeant's testimony, Mrs. Anderson *never* indicated that defendant had exclusive control over the upstairs rooms. Instead, defendant's mother stated that she "usually" does not go up there, but the grandchildren do go upstairs "from time to time." According to Sgt. Payer's testimony, on April 3, 1998, Mrs. Anderson was evasive when asked if anyone else besides defendant goes upstairs.

The Court further notes that the Sixth Circuit has declined to follow the reasoning of the D.C. Circuit in *Whitfield. See U.S. v. Austin,* 81 F.3d 161, 1996 WL 109500 (6th Cir.1996) (unpublished disposition opinion); *see also United States v. Hall,* 979 F.2d 77 (6th Cir.1992), *cert. denied,* 507 U.S. 947, 113 S.Ct. 1357, 122 L.Ed.2d 736 (1993). In *Austin,* the 25 year-old defendant lived at his parent's home, and argued that items obtained as a result of a search of his apartment located in the home should have been suppressed at trial. The Sixth Circuit disagreed, stating that "we choose not to follow *Whitfield,* in light of our own circuit's holding in *Hall,* which we think controls this case." *Austin,* 1996 WL 109500, *3. In *Hall,* the Sixth Circuit "upheld the validity of consent to search a room given by the owner, where the owner simply allowed the defendant to live there, the room was never locked, and the owner never entered the room after the defendant began living there." *See Austin,* 1996 WL 109500, *3 (citing *United States v. Hall,* 979 F.2d 77 (6th Cir.1992)). The Tenth Circuit, in *United States v. Rith, supra,* has likewise rejected the reasoning of the court in *Whitfield. See Rith,* 164 F.3d at 1329 ("[t]his panel ... rejects Rith's argument that the *Whitfield* test be used"); *see also United States v. Robinson,* 999 F.Supp. 155, 160 (D.Mass.1998).

 The final issue which must be addressed concerns the voluntariness of Mrs. Anderson's consent. The burden is on the government to show that Mrs. Anderson voluntarily provided her consent, as evidenced by her signature on the consent form. *See Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968) (holding that prosecutor who seeks to rely upon consent to justify lawfulness of a search has burden of proving that consent was, in fact, freely and voluntarily given). In *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court held that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. 2041. Ms. Anderson's consent " 'must be proven by clear and positive testimony....' " *U.S. v. Gilbert,* 829 F.Supp. 900, 905 (E.D.Mich. 1993) (Zatkoff, J.) (quoting *U.S. v. Garcia,* 866 F.2d 147, 150 (6th Cir.1989)). In evaluating the voluntariness issue, this Court must determine whether Ms. Anderson's " 'will has been overborne and [her] capacity for self-determination critically impaired.' " *Id.* (quoting *Schneckloth,* 412 U.S. at 255, 93 S.Ct. 2041).

 In the case at bar, the government has put forth "clear and positive" evidence that Mrs. Anderson voluntarily consented to the search, embodied in the signed consent-to-search form executed on April 3, 1998 at 12:10 a.m. The defendant called Mrs. Anderson to the stand to testify to the events leading up to the signing. As previously mentioned, according to Mrs. Anderson's testimony, she is illiterate due to lack of education and not due to physical infirmity. She further testified at the hearing that the officers threatened to come back during daylight hours, indicating that if they had to return they would tear the place up. Mrs. Anderson also alleged that she felt scared. Sgt. Payer denies that any threats of any kind were made.

The Court finds Mrs. Anderson's testimony to be *simply not credible.* She claims to be illiterate, but signed and dated the form quite legibly and in the appro-

priate boxes. Sgt. Payer testified that he read the form aloud to Mrs. Anderson and that he observed her reading along with him. Furthermore, the sergeant denies that any threats were made in an attempt to coerce Mrs. Anderson into signing the form. Threats or other improper behavior appear unlikely given the fact that, as Mrs. Anderson admits, the sergeant took the time to sit with her at the dining room table, go over the form with her, and explain its contents. As previously indicated, the Court also finds it extremely doubtful that Mrs. Anderson has "never" been upstairs, even taking into consideration her illness. As Sgt. Payer testified, he was told by Mrs. Anderson that the two small grandchildren who reside with her do occasionally go upstairs.[5]

In light of the above, this Court holds that defendant's mother, Mrs. Bobbie Anderson, did voluntarily give her valid third-party consent to search the upstairs rooms on April 3, 1998. Accordingly, the evidence obtained as a result of the search conducted pursuant to the signed consent form on the night in question need not be suppressed.

### ORDER

NOW, THEREFORE, IT IS HEREBY **ORDERED** that defendant's motion to suppress evidence is **DENIED.**

**SO ORDERED.**

---

**5.** It should also be mentioned that Mrs. Anderson admitted at the hearing that she was able to walk up the steps leading to the U.S. Courthouse on the day of the hearing. Although such testimony is by no means dispositive, it does call into question her testimony that she is physically unable to climb stairs.