**UNITED STATES of America, Plaintiff,**

v.

**Manuel A. SOSA and Jose R. Idelfonso, Defendants.**

**No. 99–CR–81144.**

United States District Court, E.D. Michigan, Southern Division.

May 31, 2000.

---

Margaret Davis, Assistant United States Attorney, Detroit, MI, for Plaintiff's.

Timothy Barkovic, St. Clair Shores, MI, for Manuel A. Sosa.

Thomas V. Wilhelm, Bloomfield Hills, MI, for Jose R. Idelfonso.

### MEMORANDUM AND ORDER DENYING DEFENDANTS' MOTION TO SUPPRESS

COHN, District Judge.

#### I. Introduction

. This is a criminal case. Defendants Manuel A. Sosa (Sosa) and Jose R. Idelfonso (Idelfonso) are charged in a two count indictment with (1) conspiracy to distribute and to possess with intent to distribute a controlled substance—heroin, in violation of 21 U.S.C. §§ 846 and 841(a)(1), and (2) aiding and abetting in the possession with intent to distribute a controlled substance—heroin, in violation of 21 U.S.C § 841(a)(1) and 18 U.S.C. § 2.

Before the Court are defendants' motions to suppress, contending that (1) the initial stop by the state troopers, who seized the heroin, was pretextual, (2) the consent to search their automobile was not knowingly, voluntarily and intelligently made, and (3) as a consequence, all evidence obtained must be suppressed as fruits of the poisonous tree.[1]

A hearing on the motions was held on March 9, 2000, at which the Court heard testimony and reviewed documentary evi-

---

**1.** Neither defendant challenges the troopers probable cause to search the automobile.

dence. The parties filed supplemental briefs following the hearing.

For the reasons that follow, defendants' motions are DENIED.

## II. Factual background

### A. The surveillance

Detective James Bolden (Bolden) of the Michigan State Police was part of the Oakland County Macomb Interdiction Team (OMIT), an FBI task force assisting in the apprehension of drug traffickers. Bolden, through his work with OMIT, had prior information that Sosa was involved in drug trafficking and knew that Sosa drove a 1987 Buick LaSabre with tinted windows and out-of-state license plates.

While on patrol on December 14, 1999, Bolden and another officer observed a LaSabre matching Sosa's at a motel on Telegraph Road in the Southfield area. Bolden contacted the motel and was informed that Sosa was registered. An automobile check confirmed that the LaSabre was registered under the name Manuel Sosa. At that point, Sosa was placed under surveillance and other officers were called in to assist. While under surveillance, Sosa was observed traveling with another male, later identified as Idelfonso, a female later identified as Vejan Bruno (Bruno), and two small children, later identified as Bruno's.

While under surveillance, on December 14 and 15, 1999, police observed Sosa's LaSabre make briefs stops at different Detroit residences on streets that are known for drug trafficking.

On the evening of December 15, 1999, Bolden observed Sosa and his travel companions load their luggage into the LaSabre and proceed on the Detroit area freeways as if they were leaving town. At that point, Bolden radioed the Michigan State Police Dispatch and requested a uniformed officer and marked car to assist in making a "pipeline" [2] stop of Sosa's LaSabre. Bolden also radioed to dispatch that there was probable cause that Sosa was involved in drug trafficking. Bolden requested that after the uniformed officer stops Sosa, "see if he'll give them permission to look through the car."

### B. The stop

#### 1. The troopers testified as follows:

Michigan Police Troopers Lil Drew (Drew), James Kemp (Kemp) and Ed Price (Price) responded to dispatch. Troopers Kemp and Price were in one car, Trooper Drew was in another. Dispatch gave the location of Sosa's LaSabre and relayed Bolden's request for a "pipeline" stop and instructions to obtain consent to search the LaSabre. The troopers were given the relative location and description of Sosa's LaSabre. Dispatch also informed the troopers that there was probable cause regarding Sosa's drug activities.

Troopers Kemp and Price spotted Sosa's LaSabre and began following him. Trooper Price then observed the LaSabre following too closely behind another car for about ¾ of a mile, change lanes without signaling, and cut off another car. At that point, the troopers signaled the LaSabre to stop. While in the process of pulling the LaSabre over, the troopers observed the driver (Sosa) reach across the dashboard. It appeared to the troopers that Sosa was attempting to hide something or reach for something, possibly a gun. At the same time, the backseat passenger, Bruno, bent down in the back seat and went out of sight for approximately seven seconds.

Troopers Kemp and Price approached the LaSabre and asked Sosa for his driver's license, registration, and proof of insurance. Sosa produced only his license. Sosa appeared nervous, was breathing heavily, and his hands were shaking while looking for the registration and proof of insurance. The troopers asked Sosa if he spoke English. Sosa stated he understood a little. The troopers then asked if they could search the LaSabre. Sosa replied

---

2. The precise meaning a "pipeline" will be discussed infra.

"yes, go ahead and look." At some point, the troopers learned that Bruno spoke English and Spanish. The troopers then asked Bruno to ask Sosa if they could search the LaSabre. Sosa again replied "yes, go ahead and look."

Trooper Drew, who also heard the radio dispatch requesting a "pipeline" stop, arrived at the scene after troopers Kemp and Price had made the stop. Sosa was outside the LaSabre. Trooper Drew approached and heard Sosa give consent after being asked in both English and Spanish.

The troopers searched the LaSabre and found 75 grams of heroin and approximately $1,000.00 cash inside a plastic diaper bag located on the floor of the back seat. The troopers arrested Sosa, Idelfonso, and Bruno. A further search of the LaSabre revealed $7,000.00 cash in a Tommy Hilfiger bag in the trunk. A search of Idelfonso revealed $9,930.00 cash in his socks. At some point, Sosa was issued a traffic citation for following too closely and given a warning for the improper lane change.

    2.   Bruno testified as follows:

Sosa paid Bruno $1,000 to accompany him and Idelfonso from New York to Detroit, Michigan in order to perform translating services for Sosa. Bruno thought that they were in Detroit so Idelfonso could buy a car. Bruno also brought her two minor children, a three year old daughter and a one year old son, on the trip to Detroit. While in Detroit, Sosa made phone calls, during which Bruno would act as an interpreter. Through these conversations, Bruno learned that Sosa was here to collect money. Bruno also described the stops at various residences in the city.

On the evening of December 15, 1999, Bruno was riding in the backseat with her two children and were on their way back to New York. During the ride, Sosa sped up a little bit and got too close to the car ahead of him, which Bruno recalled was either dark blue or black. Bruno recalled Sosa changing lanes, but did not hear the click sound associated with a turn signal. Bruno also recalled that the car traveling in the lane Sosa had just entered honked its horn. Bruno was concerned about Sosa's driving because she had her two children with her. She then saw the lights from the trooper's car as they signaled for Sosa to pull over.

While pulling over, Sosa reached into the glove box and pulled out some papers. Sosa then said to Bruno and Idelfonso, in Spanish, that he had a license and not to worry. Bruno said that she reached down in the backseat in order to retrieve a bottle for her son. Bruno described Sosa as appearing nervous.

When the troopers approached the LaSabre, they asked, in English, for Sosa's license, which Sosa produced. Sosa then asked Bruno, in Spanish, what the troopers said and Bruno told him that the troopers wanted his license and registration. The troopers asked Sosa to get out of the LaSabre. Sosa complied and walked to the back of the LaSabre with the trooper. The troopers then asked Bruno if she could translate. She said yes. As she was walking to the back of the LaSabre, Bruno heard Sosa say, in English, "go ahead" and was waving his arms in a manner that indicated to Bruno that Sosa had given the troopers permission to search the LaSabre. Bruno then translated the troopers' request to search the LaSabre into Spanish. Sosa responded yes, in Spanish. Bruno told the troopers Sosa said yes.

On cross-examination, Bruno credibly explained that she never mentioned to the FBI agent who interviewed her after the incident that Sosa had been following too closely behind another car and had changed lanes without signaling because she had not been asked about Sosa's driving.[3] She likewise did not tell the grand

---

**3.** FBI agent Mike Connelly (Connelly) testified at the hearing. He explained that he did not ask Bruno about Sosa's driving because his focus was on the drugs. Connelly also

jury of Sosa's driving because she was never asked. Bruno said that she did not recall seeing the troopers write a traffic ticket or recall hearing the troopers indicate that Sosa had committed traffic offenses.

Bruno was not charged and was given immunity, contingent on her testifying truthfully as to the events she remembered.

### III. Analysis

### A. Pretextual stop

■ Sosa and Idelfonso dispute whether the troopers stopped the LaSabre on December 18, 1999 because of traffic violations or because they knew that the occupants were under surveillance for suspicion drug trafficking. A police officer who has probable cause to believe a civil traffic violation has occurred may stop an automobile regardless of his or her subjective motivation for doing so. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Ferguson,* 8 F.3d 385 (6th Cir.1993) (en banc), *cert. denied,* 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994).

In *Whren,* the Supreme Court stated:

We think these cases [prior Supreme Court precedent] foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved. We of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.

517 U.S. at 813, 116 S.Ct. 1769. Because the police in *Whren* had probable cause to believe that petitioners had committed a traffic offense, the Supreme Court held that the stop was legal.

In *United States v. Akram,* 165 F.3d 452 (6th Cir.1999), the Court of Appeals for the Sixth Circuit upheld, 2–1, the district court's denial of a motion to suppress where the defendant argued that the traffic stop was a pretext. The police in *Akram* stopped a U–Haul truck for failure to change lanes, although the officer testified that his true motivation was to look for contraband. Apparently, the officers stopped the U–Haul the day before for going two miles over the speed limit, searched the U–Haul and found videotapes, which they did not know were illegal until after the defendants were released. Although the Sixth Circuit affirmed the district court's denial of the motion to suppress, both the majority opinion and dissent noted that the credibility of the police officers' testimony as to the reason for the stop is critical.

Likewise, in *United States v. Hill,*[4] 195 F.3d 258 (6th Cir.1999), the Court of Appeals for the Sixth Circuit, in discussing *Akram,* underscored a concern that police officers may use traffic laws to stop and search certain automobiles for drugs but nevertheless affirmed the district court's denial of defendant's motion to suppress. After quoting from portions of the dissent in *Akram,* the court stated:

We share in the concern that police officers are using the state of the law in this Circuit as carte blanche permission to stop and search "target" or "profile" automobiles for drugs. Of course, the Supreme Court in *Whren* confirmed that a police officer is legally allowed to stop a vehicle for a traffic violation when

---

said that Bruno provided detailed information regarding the houses she stopped at with Sosa and Idelfonso while in Detroit.

**4.** The police in *Hill* followed a U–Haul truck simply because from their training they knew that U–Hauls were often used to transport narcotics. The police stopped the automobile for going 62 in a 55 mile per hour zone. Based upon questioning and a canine identification, the police searched the U–Haul and found drugs.

there is probable cause for the traffic stop, without regard for the officer's subjective motivation. See 517 U.S. at 812–13, 116 S.Ct. 1769, 135 L.Ed.2d 89. However, we agree that it is the responsibility of the courts to make sure that police officers act appropriately and not abuse the power legally afforded to them by, among other things, carefully scrutinizing a police officer's testimony as to the purpose of the initial stop. 195 F.3d at 267

■ Here, the Court has assessed the trooper's testimony, as well as Bruno's, and finds their testimony fully credible. Based upon the observations of the troopers, which were confirmed by Bruno, the troopers had probable cause to stop Sosa's LaSabre because it was following too closely to the car ahead of it, and failed to signal before changing lanes, in violation of Michigan law. See M.C.L.A. § 257.643.[5] Although the troopers knew of Sosa's suspected drug activity, which then became the impetus for locating Sosa's LaSabre and following him, the troopers stopped the LaSabre only after Sosa committed traffic violations. As *Whren* makes clear, whether the troopers had other motives behind stopping the vehicle is irrelevant so long as the stop itself was legally justified. Because the traffic stop was based on probable cause, defendants' pretext argument fails.

### B. Scope of the stop

■ Idelfonso argues that the troopers went beyond the scope of the stop and were not justified in requesting Sosa's consent to search the LaSabre. The troopers "must conduct the stop with the least in-trusive means reasonably available and not detain the individual longer that necessary to effectuate the purpose of the stop, *unless* the officer has an articulable reasonable suspicion that the individual is engaged in criminal activity." *Hill*, 195 F.3d at 267 (emphasis added). *See also United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (en banc), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999); *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995).

■ The Court has, as the Sixth Circuit stated in *Hill*, carefully assessed the troopers' testimony "to insure that the reasons rise to the level of reasonable suspicion, so that the officer does not abuse his authority under *Whren*." 195 F.3d at 267. Here, the troopers had a reasonable suspicion to go beyond the purpose of the stop because they had information that the occupants were suspected of drug trafficking.

### C. Consent to search

Sosa and Idelfonso argue that due to Sosa's difficulty in understanding English, there is an issue as to whether Sosa's consent was valid. Sosa also says by the time he gave his consent after hearing the question in Spanish, the troopers had already begun their search.

■ A search is not "unreasonable," and thus not violative of the Fourth Amendment, if the suspect voluntarily consents to the search. The government bears the burden of proving the consent to search was voluntary under the totality of the circumstances. *Schneckloth v. Busta-monte*, 412 U.S. 218, 248, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). This burden entails

---

**5.** This section provides:
  (1) The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon, and the condition of, the highway.
  (2) A person shall not operate a motor vehicle with a gross weight, loaded or unloaded, in excess of 5,000 pounds outside the corporate limits of a city or village, within

500 feet of a like vehicle described in this subsection, moving in the same direction, except when overtaking and passing the vehicle.
  (3) A distance of not less than 500 feet shall be maintained between 2 or more driven vehicles being delivered from 1 place to another.
  (4) A person who violates this section is responsible for a civil infraction.

proving by "clear and positive" testimony that the consent was "unequivocal, specific, intelligently given and not influenced by any duress or coercion." *United States v. Taylor*, 956 F.2d 572, 573 (6th Cir.1992).

■ Trooper Price said that while Sosa was nervous, he was not so distraught as to indicate he lacked the ability to consent. He also said that Sosa understood the request for consent because it was posed in both English and Spanish *before* the search was conducted. Bruno's testimony confirmed this observation. Thus, Sosa's consent, which was requested in both English and Spanish, and which Sosa gave in both English and Spanish, was valid.

### D. "Operation Pipeline"

Despite the conclusion that defendants' motions must be denied, comment on the law enforcement practice known as "Operation Pipeline,"[6] and in particular, a "pipeline" stop, neither of which the Court was previously aware, is in order. In general terms, "Operation Pipeline" is a drug interdiction program implemented nationwide through the use of state and local law enforcement agencies. Here, OMIT was the agency involved. "Operation Pipeline" focuses its attention along the highways and interstates most often used in drug trafficking, for either the transportation of drugs or drug money. In effectuating the goals of "Operation Pipeline," i.e. apprehending drug traffickers, police have employed a technique known as a "pipeline" stop. In basic "pipeline" stop is used to extend a traffic stop into searching for drugs or other contraband. The stop may be used where police have information that an individual in an automobile is suspected of drug trafficking, as in this case, or where the automobile and/or occupants fit a "drug courier profile," which may include traveling along a know drug corridor. In these circumstances, police will stop the automobile when it commits a traffic violation. Once stopped, police will attempt to gain consent to search the vehicle in order to locate evidence of drug trafficking. A "pipeline" stop might also occur after the automobile is stopped for a traffic violation, and through questioning the occupants or other observations, police become suspicious of drug trafficking and request consent to search the automobile.

Here, the transcripts of the tapes between Bolden and dispatch, and between dispatch and the troopers who were involved in the stop, clearly reveal that the term "pipeline" was used in describing the type of stop Bolden requested. The troopers were informed that drugs were suspected and were instructed to make a stop and try to get consent. Indeed, this was a quintessential "pipeline" stop.

The point of the discussion of "Operation Pipeline" is this: Given the Supreme Court's holding in *Whren*[7] that police motives for making an otherwise valid traffic stop are immaterial, and given the caselaw in the Sixth Circuit requiring a close examination of police testimony, it is important to have an awareness of the existence of "Operation Pipeline" in evaluating the

---

**6.** "Operation Pipeline" was initiated by the Drug Enforcement Administration. The DEA trains state and local agencies in its methods and goals.

**7.** The holding in *Whren* has been the subject of several commentaries, many of them critical. *See e.g.,* Kenneth Gavsie, Note, *Making the Best of "Whren:" The problems with Pretextual Traffic Stops and the Need for Restraint,* 50 Fla. L.Rev. 385 (1998); David O. Markus, *Whren v. United States: A Pretext to Subvert the Fourth Amendment,* 14 Harv. BlackLetter L.J. 91 (1998); Peter Shakow, Casenote, *Let He Who Never Has Never Turned Without Signaling Cast the First Stone: An Analysis of Whren v. United States,* 24 Am. J.Crim. L. 627 (1997); Jennifer R. Walters, *United States v. Whren: the U.S. Supreme Court Determines the Constitutional Reasonableness of Pretextual Traffic Stops and Tips the Scales in Favor of Law Enforcement,* 19 Thomas Jefferson L.Rev. 247 (1997); Craig M. Glantz, Essay, *Could This Be the End of Fourth Amendment Protection for Motorists?,* 87 J.Crim. L & Criminology 864 (1997); Matthew J. Saley, Casenote, *Whren v. United States: Buckle–Up and Hold On Tight Because the Constitution Won't Protect You,* 28 Pac. L.J. 595 (1997).

credibility of a police officer's testimony regarding the existence of probable cause to make a traffic stop. While, under *Whren,* "Operation Pipeline" is not itself illegal, judges should be mindful of the potential affect a request to make a "pipeline" stop may have on a police officer's observations of an automobile.[8]

The holding in *Whren* underscores the difficulty in balancing the societal interests of combating crime though effective law enforcement and upholding the rule of law, including adhering to constitutional rights. Judges must take care to insure that the legal interest takes precedence. As Justice Frankfurter said:

Loose talk about war against crime too easily infuses the administration of justice with the psychology and morals of war. It is hardly conductive to the soundest employment of the judicial process. Nor are the needs of an effective penal code seen in the truest perspective by talk about a criminal prosecution's not being a game in which the Government loses because its officers have not played according to rule. Of course criminal prosecution is more that a game. But in any event it should not be deemed to be a dirty game in which 'the dirty business' of criminals is outwitted by 'the dirty business' of law officers. The contrast between morality professed by society and immorality practiced on its behalf makes for contempt of law. Respect for law cannot be turned off and on as though it were a hot-water faucet.

*On Lee v. United States,* 343 U.S. 747, 758–59, 72 S.Ct. 967, 96 L.Ed. 1270 (1952) (Frankfurter, J., dissenting).

SO ORDERED.

---

**8.** It is also notable that *Akram* and *Hill* were "profiling" cases, in which the police, unlike here, had no prior information that the occupants may be involved in illegal activity. A "profiling" case involves a traffic stop where the vehicle and/or its occupants fit a so called "drug courier profile" or are "target" vehicles. Judges should be even more wary of a "pipeline stop" in a "profiling" and/or "target" automobile case, as was the case in *United States v. Freeman,* 209 F.3d 464 (6th Cir. 2000). The defendants in *Freeman* were driving a motor home along a highway and were stopped for crossing the white line. The police then obtained consent to search the automobile and discovered drugs. Defendants moved to suppress. The district court denied the motion. The Sixth Circuit reversed, finding the police lacked probable to make the traffic stop. The Sixth Circuit also gave the following warning to law enforcement: "they are not to abuse the authority provided to them under *Whren* and *Ferguson.* Although illegal narcotics have a widespread and devastating effect on our country, the answer in controlling drug use does not lie in sacrificing our precious Fourth Amendment constitutional guarantees." *Id.* at 471 (Clay, J., concurring)

The analysis in *Freeman* illustrates the only relevant inquiry in the wake of *Whren.* The issue is no longer one of pretext, but rather of whether probable cause existed for the traffic stop, and whether police testimony on this issue is credible.