**UNITED STATES of America,**
**Plaintiff,**

v.

**John J. CERVINE, a/k/a**
**"Chief," Defendant.**

**No. 00–40024–21–SAC.**

United States District Court,
D. Kansas.

Sept. 4, 2001.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case comes before the court on defendant John J. Cervine's motion to suppress evidence derived from a traffic stop on March 11, 2000, and all statements he made on that date. The parties presented their positions in memoranda filed with the court and in oral arguments and evidence submitted in a hearing conducted on July 26, 2001.

**FACTS**

In the latter half of 1999, state and federal agents were investigating several individuals for their possible involvement in the production and trafficking of methamphetamine in southeast Kansas. Preliminary information identified Johnny Shane Wright as a methamphetamine manufacturer and Timothy Cline as a customer and a supplier of pseudoephedrine for Wright.

Based upon information including wiretaps of telephone calls on March 7th and 11th, 2001 between Cervine and Timothy Cline, DEA agents believed Cervine, a Kentucky resident, was involved with Cline in trafficking illegal drugs. On March 11, 2000, DEA agents observed Cervine's truck, which was hauling a motorcycle, arrive at Biker's Dream, Cline's shop in Baxter Springs, Kansas. Approximately five hours later Cervine left in his truck with the motorcycle, followed surreptitiously by DEA agents.

Thereafter, Cervine drove in a manner officers thought to be counter-surveillance.

DEA agents contacted the Missouri Highway Patrol for assistance, told them there was a "very good chance that [Cervine's vehicle] would be transporting drugs," (Ryan testimony p. 126, and instructed them to stop Cervine for any traffic violation they observed and to try to obtain his consent to search the vehicle. The Highway Patrol called its canine unit, and placed it on stand by for a quick response time in the event it were needed.

Missouri State Highway Patrol officers stopped Cline while driving on a four lane highway divided by a median because they had observed his vehicle cross the line that separates the driving lane on the right from the passing lane on the left one time for approximately two seconds before returning to the right lane. This observation was made near Rogersville, Missouri, approximately two minutes after the Troopers had moved up into position to watch Cervine for a traffic violation.

At the evidentiary hearing, Cervine admitted the left tires of his vehicle could have crossed the center line, and that he does not dispute the testimony by Troopers that they did so. It was cold, windy, and dark at the time.

Trooper Mease approached the driver's side of the vehicle, and Trooper Stuart approached the passenger's side. Two female passengers were in the vehicle. Trooper Mease asked for Cervine's license and advised him that he had been pulled over for traveling over the center line. Cervine produced a Kentucky driver's license, and said that the trailer he was towing did not have enough tongue weight and was causing his truck to swerve.

Trooper Mease then asked Cervine to come with him to his patrol car, as is this trooper's habit. Cervine complied. In the patrol car, Trooper Mease asked Cervine if he had anything illegal in his truck. Cervine said he did not, asked if the troopers

wanted to search it, and said that they could go ahead and search it. Trooper Mease asked if Cervine would mind if he searched his vehicle, and Cervine replied that he would not mind.

The two troopers then approached the vehicle, and saw that the vehicle was cluttered with clothes and other items. The troopers believed that it would not be safe to remove the females from the truck onto the highway in that weather for the length of time necessary to do a search, and believed it would be quicker and safer to call the canine unit.

Troopers then returned to the patrol car to call the canine unit which was off duty, but had been placed on stand by for purposes of this stop. The canine unit was approximately five miles from the location of the traffic stop. Defendant and his passenger testified that they were detained for approximately three hours before the drug dog arrived. The government says the dog arrived about thirty minutes after Cervine was stopped.

When the canine unit arrived, the handler prepared the dog, and within a few minutes of its arrival the drug dog alerted to the console area of the pickup where methamphetamine and marijuana were found packaged in vacuum sealed packages. Trooper Mease seized the contraband, walked back and placed Cervine under arrest, and read him his Miranda rights from a card he maintains for this purpose. Trooper Mease asked Cervine whether he understood those rights, and Cervine said that he did. When asked whether he wanted to talk to Trooper Mease, Cervine said that he had nothing to say at that time.

Cervine was then transported to Troop D headquarters, where he told Sergeant Banasik that he had already been advised of his rights. Sergeant Banasik again informed Cervine of his *Miranda* rights and Cervine stated that he understood them.

Sergeant Banasik asked whether Cervine was willing to answer some questions, and he responded affirmatively. During his interrogation by Sergeant Dan Banasik, Cervine stated that the drugs may have been placed in the vehicle without his knowledge as some sort of a joke or in retribution for something, and admitted that he'd given troopers consent to search his vehicle. Cervine answered some questions and declined to answer others. Additional facts are included in the analysis below.

## Initial Stop

Defendant contends that his single incident of drifting out of the right lane into the passing lane for traffic flowing in the same direction did not give the troopers probable cause to believe a traffic law had been violated.

### *Governing Law*

█ The Fourth Amendment protects individuals from unreasonable searches and seizures. *See* U.S. Const. amend IV. An unconstitutional seizure may render an otherwise constitutional search invalid under the Fourth Amendment if the search resulted from the illegal seizure or detention. *United States v. Miller,* 84 F.3d 1244, 1250 (10th Cir.), *cert. denied,* 519 U.S. 985, 117 S.Ct. 443, 136 L.Ed.2d 339 (1996), *overruled on other grounds, United States v. Holland,* 116 F.3d 1353, 1357–59 (10th Cir.), *cert. denied,* 522 U.S. 902, 118 S.Ct. 253, 139 L.Ed.2d 181 (1997), *overruled in part on other grounds, Bousley v. United States,* 523 U.S. 614, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). As established by Supreme Court precedent, there are three general types of police-citizen encounters: "(1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activ-

ity; and (3) arrests, [which are] the most intrusive ... and [are] reasonable only if supported by probable cause." *United States v. Davis,* 94 F.3d 1465, 1467–68 (10th Cir.1996) (citations omitted).

 A routine traffic stop is a seizure under the Fourth Amendment. *United States v. West,* 219 F.3d 1171, 1176 (10th Cir.2000). Analogous to investigative detentions, routine traffic stops are analyzed under the principles stated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *United States v. Hunnicutt,* 135 F.3d 1345, 1348 (10th Cir.1998). The reasonableness of an investigative detention is a dual inquiry: (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference." *United States v. Burch,* 153 F.3d 1140, 1141 (10th Cir.1998) (quotation omitted); *see Terry,* 392 U.S. at 20, 88 S.Ct. 1868.

 For purposes of the first prong, "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero–Ospina,* 71 F.3d 783, 787 (10th Cir.1995) (en banc), *cert. denied,* 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996); *accord Whren v. United States,* 517 U.S. 806, 818, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The officer's subjective motives for stopping the vehicle are irrelevant under Fourth Amendment analysis. *See Whren,* 517 U.S. at 813, 116 S.Ct. 1769; *Botero–Ospina,* 71 F.3d at 787. The "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Botero–Ospina,* 71 F.3d at 787.

Shortly after the en banc decision in *Botero–Ospina,* a Tenth Circuit panel in *United States v. Gregory,* 79 F.3d 973 (10th Cir .1996), held under the facts presented that a single, isolated instance of veering into the emergency lane did not violate Utah law and did not create probable cause to make a traffic stop. The panel discussed that their interpretation of the Utah statute was consistent with Utah case law. The panel also noted that the motorist was driving a U–Haul truck on a winding road through mountainous terrain under windy weather conditions. "These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway which was observed by Officer Barney could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection." 79 F.3d at 978.

On several subsequent occasions, the Tenth Circuit has had no difficulty distinguishing *Gregory* or limiting the decision to its unique facts. In *United States v. Dunn,* 133 F.3d 933, 1998 WL 8227 (10th Cir. Jan. 12, 1998) (Table), the panel was presented with the scenario where a motorist in Kansas was stopped after swerving once over the right white line marking the edge of the road. The panel upheld the validity of the stop and distinguished *Gregory* in the following respects:

Contrary to defendant's assertions, however, *Gregory* did not establish a bright-line rule that a single instance of swerving could *never* constitute a violation of the statute, but rather held that *under the particular circumstances of that case,* the motorist's single swerve did not provide sufficient justification for a stop. In *Gregory,* we conducted a fact-specific inquiry and emphasized that, in addition to windy conditions, "[t]he road was winding, the terrain mountainous." *Id.* In contrast, the section of I–70 along which Dunn was traveling was straight

with a slight grade, not winding and mountainous. Moreover, although we did not specifically rely on this factor in deciding *Gregory,* we note that the defendant in *Gregory* was driving a U–Haul truck, a vehicle that is more difficult to control than the sedan Dunn was driving. Thus, although *Gregory* and the present case involve very similar statutes, the facts of the two cases are distinguishable. In light of the circumstances present in this case, we find that Trooper Gassman had probable cause to believe defendant had committed a violation of K.S.A. § 8–1522.

133 F.3d 933, 1998 WL 8227 at *2 (footnote omitted).

In a later case the Tenth Circuit emphasized the unique facts in *Gregory* and created a fact-specific analysis for the traffic statute:

We agree that under the language of the Kansas statute, when an officer merely observes someone drive a vehicle outside the marked lane, he does not automatically have probable cause to stop that person for a traffic violation. The use of the phrase "as nearly as practicable" in the statute precludes such absolute standards, and requires a fact-specific inquiry to assess whether an officer has probable cause to believe a violation has occurred.... However, decisions like *Gregory* do not establish an absolute standard or bright-line rule regarding what conduct constitutes a violation of statutes like Kan. Stat. Ann. § 8–1522, but instead highlight the need to analyze objectively all the surrounding facts and circumstance to determine whether the officer had the probable cause necessary to justify the stop.

*United States v. Ozbirn,* 189 F.3d 1194, 1198 (10th Cir.1999) (upholding probable cause when the motor home drifted twice "onto the shoulder within a quarter mile under optimal road, weather and traffic conditions."); *see, United States v. de la Fuente–Ramos,* 242 F.3d 391, 2000 WL 1717186 (10th Cir. Nov. 16, 2000) (Table) (upholding probable cause when van weaved more than once and distinguishing *Gregory* as involving only one weaving episode under "road and weather conditions that could have caused even an unimpaired motorist to weave."), *cert. denied,* — U.S. ——, 121 S.Ct. 1391, 149 L.Ed.2d 314 (U.S. Mar. 19, 2001); *United States v. Rodriguez,* 215 F.3d 1338, 2000 WL 639581 (10th Cir. May 18, 2000) (upholding probable cause where car swerved onto shoulder twice under windy conditions and concluding "that the windy weather conditions alone in this case do not distinguish it from *Ozbirn.*"); compare *United States v. Ochoa,* 4 F.Supp.2d 1007, 1012 n. 4. (D.Kan.1998) (finding no probable cause where troopers caused or contributed to causing a motorist's a single crossing onto the shoulder of the road).

### Analysis

Troopers testified that Cervine was stopped for a violation of MO ST 304.015, which provides:

6. All vehicles in motion upon a highway having two or more lanes of traffic proceeding in the same direction shall be driven in the right-hand lane except when overtaking and passing another vehicle or when preparing to make a proper left turn or when otherwise directed by traffic markings, signs or signals.

This statute contains no qualifying language such as the phrase "as nearly as practicable" in the Kansas failure to maintain a lane statute. It is not alleged that any of the exceptions stated in the above statute apply to Cervine. Under Eighth Circuit law, whose jurisdiction includes Missouri, "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Barahona,* 990

F.2d 412, 416 (8th Cir.1993); *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990), *reh'g denied* (January 17, 1991) (en banc), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448 (1991).

■ Here, although testimony established that it was "windy" that night, Cervine has not alleged and no evidence has shown that it was windy enough to affect one's driving, even while pulling a trailer and motorcycle. The particular facts and circumstances of this case establish that the Troopers had probable cause to stop Cervine's vehicle for an observed violation of MO ST 304.015.6. Although the troopers knew of Cervine's suspected drug activity, which then became the impetus for locating his vehicle and following him, the troopers stopped the vehicle only after Cervine committed a traffic violation, and testified that they would not have stopped his vehicle absent a traffic violation. Troopers additionally testified that they routinely stop other vehicles for the same offense.

It is irrelevant under the Fourth Amendment that the Troopers had other subjective reasons for stopping Cervine. *Botero–Ospina*, 71 F.3d at 787. The court's "sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). The court finds that the Troopers' traffic stop of Cervine for violation of Missouri motor vehicle law was valid and justified at its inception.

**Detention**

Having established that the stop of petitioner's vehicle was legitimate, the next inquiry under Terry is whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S.

at 20, 88 S.Ct. 1868. Those circumstances include the DEA's statement that there was a "very good chance" that Cervine's vehicle was transporting drugs, the DEA's request that troopers stop Cervine for a traffic offense request his consent to search, and the troopers' observation of a traffic violation by Cervine. Defendant alleges that his detention violated his Fourth Amendment rights by exceeding the permissible length and scope of the traffic stop.

■ "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir.1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). It must be temporary, and its scope must be carefully tailored to its underlying justification. *United States v. Gutierrez–Daniez*, 131 F.3d 939, 942 (10th Cir.1997), *cert. denied*, 523 U.S. 1035, 118 S.Ct. 1334, 140 L.Ed.2d 494 (1998); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997). Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay. *Patten*, 183 F.3d at 1193; *United States v. Anderson*, 114 F.3d 1059, 1064 (10th Cir.1997).

■ A longer detention for additional questioning is permissible under two circumstances: (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring; or (2) the initial detention changes to a consensual encounter. *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998). It is uncontested that Cervine was detained for longer than was necessary to issue him a citation or warning and determine the validity of his driver's license and right to operate the

vehicle. The court therefore examines whether the detention occurred during a consensual encounter, or whether the officers had reasonable suspicion of criminal activity.

### Consensual Encounter

 If an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play. *See United States v. Walker,* 933 F.2d 812, 816–17 (10th Cir.1991), cert. denied, 502 U.S. 1093, 112 S.Ct. 1168, 117 L.Ed.2d 414 (1992). However, retention of a motorist's driver's license and/or other pertinent documents by the officer during any questioning precludes a conclusion of consent until the documents are returned. *See id.* at 817. The Tenth Circuit has consistently held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* 511 U.S. (1994); *accord United States v. Lambert,* 46 F.3d 1064, 1068 (10th Cir.1995).

 Testimony as to when Cervine's documents were returned to him is scant. Curiously, neither Trooper was asked at what point Cervine's driver's license was returned to him. Both testified, however, that Cervine was free to leave while they awaited the arrival of the canine unit, although his vehicle had to remain. One could perhaps infer from such testimony that Cervine's license had been returned to him. Cervine, however, testified that he thinks he got his driver's license back after he was arrested, although his insurance card was returned to him earlier, and otherwise testified that the Trooper "held on" to his license.

Given this testimony, the court finds insufficient evidence that Trooper Mease returned Cervine's driver's license to him before he asked whether Cervine had anything illegal in his vehicle and asked permission to search it. In fact, there is no evidence that petitioner's driver's license was returned to him at any time during his detention. Trooper Mease's request to search the car occurred soon after Cervine returned to Mease's patrol vehicle and did not occur during a consensual encounter because Cervine "would not reasonably have felt free to leave or otherwise terminate the encounter." *Lambert,* 46 F.3d at 1068. Cervine's detention cannot be justified based upon a consensual encounter.

### Reasonable Suspicion

 Cervine's extended detention may still have been lawful if the officer had a reasonable and articulable suspicion of criminal activity. *See United States v. Turner,* 928 F.2d 956, 959 (10th Cir.1991). The government bears the burden to show that an officer possessed articulate reasonable suspicion. *United States v. Carhee,* 27 F.3d 1493, 1496 and n. 2 (10th Cir.1994). Police officers cannot rely upon an "unparticularized suspicion or hunch." *Brown v. Texas,* 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Fernandez,* 18 F.3d 874, 878 (10th Cir. 1994). Whether an officer possessed the requisite articulate suspicion depends on the totality of the circumstances. *United States v. Salzano,* 149 F.3d 1238, 1242 (10th Cir.1998).

 Here, nothing occurred at the scene of the stop to arouse reasonable suspicion that Cervine was involved in criminal activity. Instead, any such suspicion arose solely by virtue of the information possessed by and/or conveyed to the troopers by the DEA. "Knowledge of facts justifying a traffic stop commonly is held by a single police officer; in limited circumstances, however, a stop may be justified by the collective knowledge of all of the officers involved in the stop." *United*

*States v. Guebara*, 2001 WL 617609 at *2 (June 5, 2001) (Table). This collective knowledge rule applies where an officer makes an investigatory stop based in part on information or directions from other law enforcement officials. *United States v. Merritt*, 695 F.2d 1263, 1268 & n. 9 (10th Cir.1982), *cert. denied*, 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

The Tenth Circuit has applied the collective knowledge analysis in determining whether there was reasonable suspicion to make an investigatory stop, *see Guebara*; as well as in determining whether probable cause for an arrest exists, *see Merritt*, 695 F.2d at 1268, n. 9. Similarly, the court believes that collective knowledge may supply the reasonable suspicion necessary to justify a defendant's continued detention. *See United States v. Jones*, 234 F.3d 234, 241 (5th Cir.2000) ("in determining whether reasonable suspicion existed to justify the defendants' continued detention, we must look at the totality of the circumstances and consider the collective knowledge and experience of the officers involved.")

■ It is well-established that when an order to stop or arrest a suspect is communicated to officers in the field, the underlying facts constituting probable cause or reasonable suspicion need not be communicated, so long as the individual or agency issuing the order can justify the intrusion on Fourth Amendment rights. *United States v. Hensley*, 469 U.S. 221, 231, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985).

■ The United States relies upon *United States v. Sosa*, 104 F.Supp.2d 722 (E.D.Mich.2000), in asserting that reasonable suspicion justifies Cervine's extended detention. There, the court held that troopers had reasonable suspicion to go beyond the purpose of the traffic stop "because the [troopers] had information that the occupants were suspected of drug trafficking." *Id.*, at 727. In *Sosa*, officers involved in an FBI task force assisting in the apprehension of drug traffickers relayed information to troopers, through their dispatch, that a certain individual in a particular vehicle in their area was suspected of drug trafficking. There, as here, troopers were requested to stop the vehicle when it committed a traffic offense and to attempt to gain consent to search the vehicle. *Id.*, at 724, 728. This law enforcement technique, under *Whren*, is not itself illegal. *Id.*, at 729. The court held that troopers stopping a motorist for a traffic infraction did not violate the Fourth Amendment by asking permission to conduct a search of the vehicle, based upon previously acquired information that the occupants of vehicle were suspected of drug trafficking.

■ DEA Special Agent Robert Ryan testified that he was aware of the following facts at the time Cervine was stopped: (1) Timothy Cline was a primary supplier of pseudoephedrine to the primary methamphetamine manufacturer in the state of Kansas and received methamphetamine and other drugs in return for redistribution and use; (2) Cline was a member and former president of the Quapaw, Oklahoma chapter of The Loners motorcycle club and Cervine was the president of The Loners motorcycle club in Kentucky; (3) outlaw motorcycle groups were known to be associated with the drug business; (4) Cervine had been arrested in 1976 for possession of a controlled substance, possession of a hand grenade and possession of a firearm; (5) Cline and Cervine had recently been seen talking with each other at the national officers' meeting of The Loners motorcycle club in Las Vegas, Nevada; (4) authorized wiretaps of Cline's residential telephone on March 7, 2000 and March 11, 2000 revealed that Cline and Cervine were friends or close associates, that Cline called Cervine "Chief," and Cer-

vine called Cline "Pony," that Cervine was planning to come to Kansas or Oklahoma and to bring his motorcycle to Cline's shop for repairs; (5) Rudolph James Maio, another friend or associate of Cline's, had been stopped in Oklahoma on February 22, 2000, after leaving Cline's motorcycle shop; troopers found approximately $34,000, some of which was wrapped in a heat-sealed bag, in the saddlebags of the motorcycle Maio was hauling, and immediately detected the odor of marijuana upon opening that wrapper; (6) Cervine drove from Kentucky to Kansas, stayed approximately five hours at Cline's shop, then returned to his vehicle and drove toward Kentucky; (7) Cervine pulled off the interstate at least twice into a rest stop or exit and drove around very slowly but did not stop. Cervine contests this last fact, testifying that he actually stopped at the areas he pulled into, but the court credits the contrary testimony of Special Agent Ryan.

Based upon these facts and the inferences reasonably flowing from them, and the experience of the DEA agent, it was reasonable to suspect that Cervine was involved in some manner with Cline in drug trafficking, that motorcycles were being used as a cover for drug trafficking, that repair of a motorcycle was not the sole reason Cervine traveled from Kentucky to Kansas, that Cervine was picking up or dropping off some drug-related material or currency in his quick trip to Kansas, that Cervine had taken counter-surveillance measures after leaving Cline's shop, and that Cervine had drug-related material or currency in the vehicle or motorcycle he was hauling at the time of the stop.

That the troopers did not actually observe any criminal activity is irrelevant as "the facts are measured against an objective reasonable man standard, not the subjective impressions of the particular officer." *United States v. Mallides*, 473 F.2d 859, 861 (9th Cir.1973). Defendant alleges that the above facts recite only innocent acts which relate to nothing but motorcycles. The court gives deference to a "law enforcement officer's ability to distinguish between innocent and suspicious actions," *United States v. Wood*, 106 F.3d 942, 946 (10th Cir.1997), and notes that reasonable suspicion may be founded upon factors consistent with innocent travel. *Id.* (quoting *United States v. Lee*, 73 F.3d 1034, 1039 (10th Cir.1996)). Under these circumstances, the troopers had a "particularized and objective basis" for making the investigatory stop of Cervine's vehicle and for detaining him for a reasonable period of time until the canine unit arrived.

The evidence as to the length of detention is disputed. Cervine testified that it took about three to three and one half hours from the time he was initially stopped by Troopers to the time the dog arrived, and about 15 minutes thereafter until he was arrested. Cervine does not recall looking at his watch, and admits that he estimated the amount of time that passed. Mary Sue Nichols, a passenger in Cervine's vehicle, testified that after being stopped by Troopers, they waited about two and one half to three hours before the canine unit arrived. She determined this because she looked at her watch.

The dispatch log from the Missouri Highway Patrol (Defendant's Exh. C 1) does not reflect the time at which the initial stop occurred, but shows that at 8:57 p.m., Troopers called for the canine unit to respond to their location, establishing that Troopers had already stopped Cervine's vehicle by that time. Trooper Scott Mease testified that the initial stop of defendant's vehicle occurred approximately ten minutes prior to that call, *i.e.*, at about 8:47 p.m. Cervine testified that it occurred in the early evening after the sun was down, estimating it to be between 7:30 and 8:00

p.m. Cervine admitted that he did not look at his watch at the time. Trooper Mease testified that the dispatch record reflect that at 8:32 p.m., Trooper Stuart called dispatch to ask whether the canine unit had been placed on stand by, and that at that time, the stop had not yet been made. The radio log of the dispatch records, Exh. C–1, confirm such a call was made at that time.

Trooper Stuart testified that within five minutes of the initial stop, they called for the canine unit to respond. The radio log reflects that this call occurred at 8:57 p.m. After the stop, and before calling the canine unit, Trooper Mease did a quick visual search of Cervine's vehicle, and found nothing. Trooper Mease stated that it took the canine unit about 20 minutes to arrive after his call, and Trooper Stuart stated that it took 20 to 30 minutes. A few minutes thereafter the dog began to search, after which the dog immediately alerted. According to the Troopers, defendant was placed under arrest at about 9:30 p.m., after the drug dog search was concluded. The dispatch log reflects that the canine unit notified dispatch at 9:40 p.m. that he was finished and was en route elsewhere.

The testimony of the Troopers is consistent with each other and with the dispatch log. The court finds that the most reliable and credible evidence of the length of the encounter is the dispatch log, coupled with the Troopers' testimony. Accordingly, the court finds that the entire encounter, from the time Cervine was initially stopped at about 8:47 p.m. to the time he was en route to Troop headquarters at 9:40 p.m., took approximately 50 minutes.

■ Similar waiting periods have withstood challenge. *See United States v. Villa–Chaparro,* 115 F.3d 797, 802–03 (10th Cir.), *cert. denied,* 522 U.S. 926, 118 S.Ct. 326, 139 L.Ed.2d 252 (1997) (extended detention of almost forty minutes spent waiting for a drug-sniffing dog did not violate the Fourth Amendment); *United States v. Garcia,* 52 F.Supp.2d 1239 (D.Kan.1999) (finding a delay of 40 minutes not unreasonable where supported by reasonable suspicion, even where the driver was being detained against his will.); *United States v. Alpert,* 816 F.2d 958 (4th Cir.1987) (upholding 50 minute detention); *United States v. Hardy,* 855 F.2d 753, 760 (11th Cir.1988); *United States v. $64,765.00,* 786 F.Supp. 906, 912 (D.Or.1991); *Cf. United States v. Borys,* 766 F.2d 304, 313 (7th Cir.1985) (75–minute detention was "at the outer bounds of the Constitution"); *United States v. Place,* 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110(1983) (declining to adopt "outside time limitation" for permissible *Terry* stop, but admonishing prior to *Sharpe* that 90 minutes is probably too long for a *Terry* stop); *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (holding that in distinguishing a true investigative stop from a de facto arrest, the court must not adhere to "rigid time limitations" or "bright line rules.")

For the above reasons, the court finds that the troopers and DEA agents collectively had the particularized and objective suspicion necessary to lengthen the Terry stop. Therefore, they did not act unconstitutionally in questioning the defendant and holding the defendant's vehicle twenty to thirty minutes while awaiting the arrival of the canine unit. *Cf. United States v. Brown,* 24 F.3d 1223, 1226 (10th Cir.1994) (finding that thirty-minute investigative detention of defendant and his car for purpose of conducting canine sniff did not violate the Fourth Amendment); *See United States v. Toledo,* 139 F.3d 913, 1998 WL 58117, *4 (10th Cir. Feb. 12, 1998) (Table).

**Voluntariness of Consent**

■ Defendant's brief alleges that Cervine's consent to search was involun-

**1216**

tary, primarily because he was never told that he was free to go, or that he could refuse to consent to any search requested.[1] Although these two factors are to be considered, *see United States v. Gregory,* 79 F.3d 973, 979 (10th Cir.1996), they are not determinative. *United States v. Pena,* 143 F.3d 1363, 1367 (10th Cir.), cert. denied, 525 U.S. 903, 119 S.Ct. 236, 142 L.Ed.2d 194 (1998); *see also United States v. Little,* 60 F.3d 708, 713 (10th Cir.1995). Whether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances. *United States v. Santurio,* 29 F.3d 550, 552 (10th Cir.1994) (citing *United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). "Consent to search may be voluntary even though the consenting party is being detained at the time consent is given." *United States v. Alauria,* 210 F.3d 390, 2000 WL 339168 (10th Cir. Mar. 31, 2000) (Table) (finding that officer did not return the driver's licenses before questioning about drugs and weapons and/or seeking consent to search, and relying on reasonable suspicion) (citing *United States v. Doyle,* 129 F.3d 1372, 1377 (10th Cir.1997)); *see United States v. Dozal,* 173 F.3d 787, 796 (10th Cir.1999).[2]

 Cervine admitted on cross-examination that he consented to the search of his vehicle, and the undisputed evidence supports this conclusion. The government presented clear and positive testimony that Cervine gave his specific and unequivocal consent to search the vehicle, and that he did so freely and intelligently. Cervine further admitted that his decision to con-

sent to the search was voluntary, and makes no allegations of coercion, duress, or other indicia of involuntariness. Cervine admits that he never told Troopers he did not want them to search the vehicle, and in fact told them that he was "Mr. Clean."

 Tenth Circuit case law recognizes that permission to search contemplates a thorough search. *United States v. Torres,* 663 F.2d 1019, 1027 (10th Cir. 1981). Officers with consent to search may search the entire vehicle if the suspect "does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent." *United States v. Bustillos–Munoz,* 235 F.3d 505, 515 n. 5 (10th Cir.2000). An individual who consents to a search may limit the scope of his consent so long as he does so expressly and explicitly. *See United States v. Wacker,* 72 F.3d 1453, 1470 (10th Cir.1995), cert. denied, 523 U.S. 1035, 118 S.Ct. 1333, 140 L.Ed.2d 493 (1998).

Cervine did state to the troopers on one or more occasions while awaiting the arrival of the canine unit, "Let's do something here." This request is neither clear nor unequivocal and does not constitute a withdrawal of consent or a limitation on the scope of the consent. Under the totality of the circumstances, the court finds that Cervine freely, intelligently, and voluntarily consented to the search.

**Post–Arrest Statements**

Defendant alleges that any statements he made after his "unconstitutional sei-

---

1. To the extent defendant may be alleging that he did not consent to a canine sniff, the court notes that a canine sniff is generally not a "search" within the meaning of the Fourth Amendment. *See United States v. Brown,* 24 F.3d 1223, 1225 (10th Cir.1994); *United States v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990).

2. Because the detention was legal, the court does not reach the issue whether there was sufficient attenuation between an illegal detention and Cervine's consent to search. *See United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985).

zure" must be suppressed as fruit of the poisonous tree, pursuant to *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Given the court's findings above that the seizure was within the bounds of constitutionality, this argument fails.

Defendant additionally contends that his statements were involuntary and were not made pursuant to a knowing and voluntary waiver, as is required under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant did not mention or put on any evidence in support of this assertion at the evidentiary hearing and oral argument, and makes no argument in support of this contention in his brief. (Dk.707, p. 9). The court finds as follows, in the event such argument is not waived.

■ A suspect who has been informed of his *Miranda* rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The government bears the burden of proving by a preponderance of the evidence that the defendant's waiver of rights was voluntary. *United States v. Toro–Pelaez,* 107 F.3d 819, 825 (10th Cir.), *cert. denied,* 522 U.S. 845, 118 S.Ct. 129, 139 L.Ed.2d 78 (1997); *Colorado v. Connelly,* 479 U.S. 157, 168–69, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

■ To prove a voluntary waiver of Fifth Amendment rights, the government must establish: (1) that the waiver was the product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. *Moran v. Burbine,* 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective. *Id.; United States v. Hernandez,* 93 F.3d 1493, 1501 (10th Cir.1996).

⸰ In considering whether a statement is of free will, the courts look to several factors, including: "(1) the characteristics of the defendant: age, education, intelligence, and physical and emotional attributes; (2) the circumstances surrounding the statement, including the length of detention and questioning and the location of questioning; and (3) the tactics, if any, employed by officers. (Citations omitted). In no case, however, is any single factor determinative." *United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied,* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 565 (1988).

"[A] defendant's statement that is extracted or induced by threats or promises is involuntary." *Hernandez,* 93 F.3d at 1503 (citing *Hutto v. Ross,* 429 U.S. 28, 30, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976)). "Incriminating statements obtained by government acts, threats, or promises that permit the defendant's will to be overborne are coerced confessions running afoul of the Fifth Amendment...." *Griffin v. Strong,* 983 F.2d 1540, 1543 (10th Cir.1993) (quoting *United States v. Short,* 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied,* 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992)). "Coercion may involve psychological threats as well as physical threats." *United States v. Finch,* 998 F.2d 349, 356 (6th Cir.1993).

■ The crucial question in each case is whether the defendant's will was overborne at the time of the confession. *See Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963). A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

 The evidence is undisputed that Cervine was advised of his *Miranda* rights at the scene of the arrest, and was again *Mirandized* by Sergeant Banasik at Troop Headquarters after his arrest. Trooper Banasik testified that when he *Mirandized* Cervine, Cervine admitted that he had been *Mirandized* at the scene of the arrest, that he understood his *Miranda* rights, and that he was willing to answer some questions. Cervine thereafter did answer questions. At the evidentiary hearing, Cervine agreed that Trooper Banasik's testimony regarding these events was accurate. No evidence of any duress, coercion, or other improper influence has been shown.

The court finds that Cervine's post-arrest statements were made after defendant was *Mirandized,* and after defendant voluntary and knowingly waived his *Miranda* rights. No basis for suppression of Cervine's statements has been shown.

IT IS THEREFORE ORDERED that defendant Cervine's motion to suppress evidence (Dk.706) is denied.

Dated this ___ day of September, 2001, Topeka, Kansas.